## S08A0921. STAHL v. THE STATE.

(669 SE2d 655)

HINES, Justice.

Patrick Phillip Stahl appeals his convictions for malice murder, burglary, possession of a firearm during the commission of a crime, and possession of a firearm by a convicted felon, all in connection with the death of Rodney Dixon. For the reasons that follow, we affirm.[1]

In his sole enumeration of error, Stahl contends that the evidence was insufficient to authorize his conviction for malice murder, contending that there was no showing of malice. Construed to support the verdicts, the evidence showed that Stahl occasionally worked at Dixon's car sales business and assisted Dixon in the selling of illegal drugs; he believed that Dixon had large amounts of cash in his house. Late in the evening of May 13, 2002, or early in the morning of May 14, 2002, Stahl, and his stepfather Freeman, resolved to rob Dixon. Stahl gathered a pistol, mask, and gloves for himself, and Freeman drove him to a store to buy a mask and gloves for Freeman. Freeman drove Stahl to a location near Dixon's residence, Stahl exited the vehicle, he went alone to the house, entered Dixon's home through a window, encountered Dixon, fatally shot him in the face, and searched Dixon's home. A day or two later, he returned to the scene of the crimes and attempted to obscure evidence of his acts.

---

[1] Dixon was killed on May 14, 2002. On September 12, 2002, a Gordon County grand jury indicted Stahl and Thomas Ray Freeman for malice murder, felony murder while in the commission of aggravated assault, felony murder while in the commission of burglary, felony murder while in the commission of attempted armed robbery, two counts of burglary, attempted armed robbery, and two counts of possession of a firearm during the commission of a crime; Stahl was also indicted for possession of a firearm by a convicted felon. Stahl and Freeman were tried before a jury November 3-7, 2003, and Stahl was found guilty of all charges except for possession of a firearm by a convicted felon, to which he pled guilty; Freeman was acquitted of malice murder and found guilty of all the other crimes for which he was charged. On December 17, 2003, Stahl was sentenced to life in prison for malice murder, twenty years in prison for burglary, to be served consecutively to the life sentence, five years in prison for possession of a firearm during the commission of a crime, to be served consecutively to the burglary sentence, and five years in prison for possession of a firearm by a convicted felon, to be served consecutively to the five-year sentence for possession of a firearm during the commission of a crime; the felony murder convictions stood vacated by operation of law, and, for purposes of sentencing, one count of burglary merged with the other count of burglary, and one count of possession of a firearm during the commission of a crime merged with the other count of that crime. See Malcolm v. State, 263 Ga. 369, 372-374 (4), (5) (434 SE2d 479) (1993). Stahl moved for a new trial on January 7, 2004, and the motion was denied on December 27, 2007. On January 18, 2008, Stahl filed a notice of appeal to the Court of Appeals; the appeal was docketed in that Court on January 29, 2008, and transferred to this Court on February 12, 2008. The appeal was docketed in this Court on February 14, 2008, and submitted for decision on April 7, 2008.

Stahl told some of his family members about the crimes, and they telephoned law enforcement officers. Stahl first told the investigating law enforcement officers that: he knocked on Dixon's door at 2:00 a.m.; was admitted; offered to sell Dixon a pistol that Stahl had gotten from his sister's room; Dixon expressed the desire to first fire the pistol and wanted Stahl to leave it with him; Stahl protested; the men argued; Stahl grabbed the pistol; Dixon pushed him; and the pistol discharged. The officers noted that he had told his family members a different version of the events, and Stahl then told the officers that he had gone to Dixon's home intending to rob him, entered through a window, and was confronted by Dixon; Stahl told Dixon that he simply wanted to leave, Dixon attempted to reach over Stahl's shoulder to activate a security system, Stahl pushed his arm, a struggle ensued, and Dixon

> just kind of dead fucking hit me. I don't remember pulling the trigger I don't remember nothing. . . . I remember hearing him say fucker or fuck or something to that point. The next thing I know is laying in the floor [sic] and I am just standing over him holding the gun and I was like well I still need to get that money so I can give it to my sister.

At trial, Stahl testified that: he believed that his sister needed money for a divorce and child custody case; to get money, he and Freeman discussed robbery; he secured a .380 pistol belonging to his sister; he first resolved to rob Dixon's grandfather, but at the last moment aborted that plan in fear; Freeman said he was disappointed in Stahl; Stahl knew Dixon to keep large sums of cash in a briefcase; late at night, he and Freeman resolved to take this money from Dixon, although Freeman was reluctant; Stahl put on dark clothing, and gathered gloves, a bandana, and two ammunition clips for the .380 pistol; shortly after midnight he and Freeman went to a store and bought a mask and gloves for Freeman; they went to another store and bought beer; Stahl consumed six bottles; Freeman demurred from actively participating in the robbery; Freeman asked Stahl why he had the pistol, and Stahl said it was to intimidate Dixon; Freeman drove Stahl to a location from which he could gain access to Dixon's home across some unoccupied land; as Stahl crossed a field, he was chased by a dog and discharged the pistol at the dog; he found the patio door of Dixon's home locked; he went to the home's carport, searched Dixon's vehicles for Dixon's briefcase, but did not find it; he took a checkbook and a telephone receiver from one of the vehicles; he telephoned Freeman and said that if he had not heard from him in 20 minutes, that Freeman should go home; he put a table under a window and stepped onto the bottom shelf of the

table; the shelf broke, causing considerable noise; he waited, heard no sound inside the house, and believed that Dixon was not home; he got onto the top shelf of the table; he went in the house through the window, and fell to the floor of the living room; as he got up from the floor, items fell from his pocket, including one of the ammunition clips, making a notable amount of noise; he retrieved the items, pulled his bandana over his face, and took out the pistol; the kitchen light came on, and Dixon was standing twelve feet from him; Stahl stood one foot from the door leading outside the house; Dixon said "Car, what are you doing?"; Car was the name of another of Dixon's employees with whom Dixon often confused Stahl; Dixon said he had no money; Stahl told Dixon he simply wanted to leave and said for Dixon not to move; Dixon approached him; Stahl raised the pistol and repeated that Dixon was not to move; Dixon reached for the security alarm behind Stahl's shoulder; Stahl pushed Dixon's hand away; Dixon struck Stahl in the face; Stahl pushed Dixon with both hands, one holding the pistol; Dixon fell to the floor; Dixon arose; Stahl told Dixon to let him leave and then Dixon could call the police; Stahl was concerned that the fact that Dixon struck him while he held a pistol showed Dixon "either didn't care or he really didn't believe I was serious"; Stahl opened the door to the outside, placed his hand on the adjacent screen door, and began to turn to look for the steps outside the house; before he knew it, Dixon was "up on" him; the pistol discharged; he did not know why he pulled the trigger; he did not remember pulling the trigger; Dixon fell; he searched the house for other occupants, and found none; he searched for the briefcase; he did not search the pockets of Dixon's clothes; he walked to a convenience store and telephoned his home to talk to Freeman; his mother answered and told him Freeman was not there; either Freeman then telephoned him or he telephoned Freeman; he told Freeman to come pick him up; Freeman arrived; in the car, he told Freeman that things had gone awry and he had shot Dixon; he said "Daddy, I'm not lying, I really did go in the house. I didn't let you down. I really did try, I really did try. I didn't find no money"; he and Freeman returned Freeman's mask and gloves to the store where they had bought them and got a refund; they returned to their home at 5:00 a.m.; either the next day or the day after, Stahl returned to Dixon's home and cleaned everything on which he might have left fibers or fingerprints; he did not take the cartridge the pistol had ejected; when first questioned by the police, he told them the story that he and Freeman had previously decided to maintain if he was arrested, so as to protect Freeman; his later statement to the police contained lies because he was angry with Freeman for not maintaining the first agreed-upon version of events; and he never told the police the truth.

Stahl asserts that his testimony shows that his only intention was to commit a robbery, not malice murder, and that he took a pistol into Dixon's house only to ensure that the situation did not escalate beyond robbery. However,

> in Georgia, the crime of malice murder is committed when the evidence shows either an express or, in the alternative, an implied intent to commit an unlawful homicide. This meaning of malice murder is consistent with the general rule that crimes which are defined so as to require that the defendant intentionally cause a forbidden bad result are usually interpreted to cover one who knows that his conduct is substantially certain to cause the result, whether or not he desires the result to occur. Thus, a malice murder can be shown not only by evidence that the defendant acted with the deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof, but also by evidence that the defendant acted where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart. In other words, evidence that the defendant acted with implied malice is, for purposes of demonstrating his guilt of the crime of malice murder, no less probative than proof that he acted with a specific intent to kill. Moreover, the malice which is required for murder can be formed in an instant so long as it is present at the time of the act of killing.

(Citation and punctuation omitted.) *Jackson v. State*, 282 Ga. 668, 671 (653 SE2d 28) (2007). And, the jury was not required to accept Stahl's version of events, or credit his denial of intent. See *Brannon v. State*, 266 Ga. 667, 668 (469 SE2d 676) (1996).

The evidence showed that Stahl went to Dixon's home with a deadly weapon, intending to rob him, and that after the shooting, he continued with his plan to steal Dixon's money, and later attempted to destroy evidence of his crimes. There was ample evidence to authorize the jury to find that Stahl acted with malice, and to enable a rational trier of fact to find Stahl guilty beyond a reasonable doubt of all of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).[2]

*Judgments affirmed. All the Justices concur.*

---

[2] Stahl also contends that the evidence was insufficient to establish the crime of felony murder, but as Stahl's felony murder conviction was vacated by operation of law, see n. 1, supra, any such issue is moot. See *Eason v. State*, 283 Ga. 116, 118 (2) (657 SE2d 203) (2008).

DECIDED SEPTEMBER 22, 2008.

*Kelley A. Dial*, for appellant.

*T. Joseph Campbell, District Attorney, Thurbert E. Baker, Attorney General, David A. Zisook, Assistant Attorney General*, for appellee.