## S08A1802. FREEMAN v. THE STATE.

(672 SE2d 644)

HINES, Justice.

Thomas Ray Freeman appeals his convictions for felony murder and possession of a firearm during the commission of a crime in connection with the death of Rodney Dixon. For the reasons that follow, we affirm.[1]

---

[1] Dixon was killed on May 14, 2002. On September 12, 2002, a Gordon County grand jury indicted Freeman and Patrick Phillip Stahl for malice murder, felony murder while in the commission of aggravated assault, felony murder while in the commission of burglary, felony murder while in the commission of attempted armed robbery, two counts of burglary, attempted armed robbery, and two counts of possession of a firearm during the commission of a crime; Stahl was also indicted for possession of a firearm by a convicted felon. Freeman and Stahl were tried before a jury November 3-7, 2003; Freeman was acquitted of malice murder and found guilty of all the other crimes for which he was charged, and Stahl was found guilty of all charges except for possession of a firearm by a convicted felon, to which he pled guilty. On December 17, 2003, Freeman was sentenced to life in prison for felony murder and five years in prison for possession of a firearm during the commission of a crime, to be served consecutively to the life sentence; the court declared that one count of possession of a firearm during the commission of a crime merged with the other count of that crime, and that all other crimes merged with the felony murder. See *Malcolm v. State*, 263 Ga. 369, 372-374 (5) (434 SE2d 479) (1993). Freeman moved for a new trial on December 17, 2003, and amended the motion on January 29, 2008. The motion was denied on April 17, 2008, and Freeman filed a notice of appeal on May 15, 2008. The appeal was docketed in this Court on July 15, 2008, and

Construed to support the verdicts, the evidence showed that Freeman was the stepfather of Patrick Phillip Stahl, his co-defendant. See *Stahl v. State*, 284 Ga. 316 (699 SE2d 655) (2008). Stahl's sister needed money for a divorce, and Stahl believed that Dixon had large amounts of cash in his house; Stahl occasionally worked at Dixon's car sales business and assisted him in selling illegal drugs. Late in the evening of May 13, 2002, or early in the morning of May 14, 2002, Freeman and Stahl resolved to rob Dixon. Stahl gathered a pistol, mask, and gloves for himself, and Freeman drove him to a store where they bought a mask and gloves for Freeman. Freeman drove Stahl to a location near Dixon's residence, Stahl exited the vehicle, went alone to the house, entered the home through a window, encountered Dixon, fatally shot him in the face, and searched the home.

Prior to being implicated in the crimes, Stahl told his cousin that Freeman approached him about getting money for Stahl's sister's divorce; Stahl said they could rob Dixon, and, after initial reluctance, Freeman agreed to participate. Other family members learned of the crimes, and telephoned law enforcement officers. Stahl first told investigating officers that he had gone to Dixon's home to sell him a pistol, and during a dispute, the pistol accidentally discharged. The officers noted that he had told family members a different version of the events, and Stahl then told the officers that: Freeman did not know of Stahl's plan to rob Dixon; because of a ruse of Stahl's, Freeman drove Stahl to a store that was open all night, from which Stahl walked to Dixon's home; after committing the crimes, Stahl telephoned Freeman to pick him up at a game room; and that he continued to tell Freeman lies about what he was doing there. He later said that he did not walk from the store to Dixon's house, but was given a ride by a stranger he met in the store parking lot.

Freeman first told the investigators that he had taken Stahl to the game room, and that when Stahl telephoned, he drove there to get him. Three days later, he told the investigators that: he took Stahl to a store, supposedly to buy a work shirt; Stahl bought some gloves; when Freeman asked Stahl why he had bought gloves, Stahl did not give a clear answer, but said that he bought them for someone; Stahl directed Freeman to drive to a location where Stahl exited the automobile; Freeman returned home, later received a telephone call from Stahl, and went to the game room to get him; Stahl told Freeman that he had shot Dixon; Stahl requested that Freeman drive him to the store to return the gloves; Freeman did not know what Stahl planned when Freeman drove Stahl to the location

where Stahl exited the automobile; and Freeman could not recall what he thought when Stahl bought gloves and asked to be let out at a certain location at midnight or later.

At trial, Stahl testified that: he and Freeman discussed a robbery; he obtained a .380 pistol belonging to his sister; he first resolved to rob Dixon's grandfather, but at the last moment aborted that plan because he became afraid; Freeman said he was disappointed in Stahl; late at night, he and Freeman resolved to take money from Dixon, although Freeman was reluctant; shortly after midnight he and Freeman went to a store and bought a mask and gloves for Freeman; Freeman decided not to actively participate in the robbery; Freeman asked Stahl why he had a pistol, and Stahl said it was to intimidate Dixon; Freeman drove Stahl to a location from which he could gain access to Dixon's home by crossing some unoccupied land; Stahl reached the house and telephoned Freeman, telling him that if he had not heard from Stahl within 20 minutes, that Freeman should go home; Stahl broke into the house and had a confrontation with Dixon, during which he shot him; Stahl left the house, walked to a convenience store, and telephoned his home so he could speak with Freeman; his mother answered and told him Freeman was not there; either Freeman then telephoned him or he telephoned Freeman; he told Freeman to come pick him up; Freeman arrived; in the car, he told Freeman that things had gone awry and he had shot Dixon; he said "Daddy, I'm not lying, I really did go in the house. I didn't let you down. I really did try, I really did try. I didn't find no money"; he and Freeman returned Freeman's mask and gloves to the store where they had bought them and got a refund; they returned to their home at 5:00 a.m.; when first questioned by the police, Stahl told them the story that he and Freeman had previously decided to maintain if he was arrested, so as to protect Freeman, to wit, that Freeman had taken him to the store and retrieved him from the game room; his later statement to the police contained lies because he was angry with Freeman for not maintaining the first agreed-upon version of events; and he never told the police the truth. See *Stahl*, supra.[2]

1. The evidence was sufficient to enable a rational trier of fact to find Freeman guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Freeman contends that his trial should have been severed from Stahl's.

---

[2] Freeman did not testify at trial.

A defendant who seeks a severance must show clearly that he will be prejudiced by a joint trial, and in the absence of such a showing, this Court will not disturb the trial court's denial of a severance motion. [Cit.] The trial court is to consider whether a joint trial will create confusion of the evidence and law, whether there is a danger that evidence implicating only one defendant will be considered against a co-defendant despite limiting instructions, and whether the defendants are asserting antagonistic defenses. [Cit.]

*Denny v. State*, 281 Ga. 114, 115-116 (1) (636 SE2d 500) (2006).

Freeman contends that his defense was hampered by being tried with Stahl, because, unlike Stahl, Freeman did not enter the house where Dixon was killed. However, the defendants were not pursuing antagonistic defenses, the evidence of each defendant's role was clear, and the jury was instructed on the law of criminal intent and participation, parties to a crime, conspiracy, and a defendant's mere presence at the crime scene. See *Jackson v. State*, 284 Ga. 484, 485 (1) (668 SE2d 700) (2008). Although Freeman argues that Stahl was essentially a State's witness against him, this is not so; the State rested its case, and Stahl took the stand in his own defense, contending that he had no intention to harm Dixon, or even to confront him, as he believed Dixon was not home.

The jury was instructed that a statement of one defendant was to be used only against the defendant who made the statement, and that the guilt or innocence of each defendant must be decided separately. That the joint trial did not produce any confusion on the jury's part regarding the evidence against each defendant is seen in the fact that the jury found Stahl guilty of malice murder while acquitting Freeman of that charge. See *Simmons v. State*, 282 Ga. 183, 185-186 (4) (646 SE2d 57) (2007). There was no abuse of the trial court's discretion in denying Freeman's motion to sever his trial from Stahl's. *Denny*, supra.

3. Freeman contends that the State failed to disclose exculpatory material in violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). In order to demonstrate a *Brady* violation, a defendant must show that: the State possessed evidence favorable to the defendant; the defendant did not possess the evidence and could not obtain it himself with reasonable diligence; the prosecution suppressed the favorable evidence; and if the evidence had been disclosed to the defense, a reasonable probability exists that the outcome of the proceeding would have been different. *Zant v. Moon*, 264 Ga. 93, 100 (3) (440 SE2d 657) (1994).

Freeman contends that, prior to his trial, the Georgia Bureau of Investigation had notes of an investigator's interview with Cunning-

ham, an inmate who had been incarcerated with Stahl. The interview was prompted by a handwritten statement of Cunningham's, which was in the possession of Freeman's counsel. In that statement, Cunningham reported that Stahl stated that Freeman was not responsible for Dixon's killing; Freeman did not know why he was giving Stahl a ride, but that Stahl intended to make Freeman a scapegoat for the crime; and if Stahl had to suffer, so did his family. The notes of the interview stated the same things, with additional detail. Freeman argues that the notes of the interview would have bolstered Cunningham's credibility and allayed counsel's fear of calling Cunningham to testify on behalf of Freeman. But, counsel testified at the hearing on the motion for new trial that his decision not to call Cunningham to testify was based not upon concerns about Cunningham's credibility and prospects of impeachment, but upon counsel's desire to preserve the right to final closing argument, which would have been forfeited under the statute operative at the time of trial had Freeman introduced evidence. See *Adams v. State*, 283 Ga. 298, 301 (3) (d) (658 SE2d 627) (2008). Accordingly, assuming that the notes of the interview were evidence favorable to Freeman that was suppressed by the State, Freeman fails to show either that the notes were not available to him through reasonable diligence, or that the course of his trial would have been any different had they been produced, and thus there was no error in the trial court's denial of Freeman's motion for new trial based upon *Brady*.

4. Finally, Freeman claims that trial counsel failed to provide effective representation. In order to prevail on this claim, Freeman must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, the defendant must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, the defendant must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. " 'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

Freeman asserts that trial counsel should have called Cunningham to testify, but as noted above, Division 3, supra, counsel did not believe that Cunningham's testimony would be helpful to an extent worth giving up the right to final closing argument, which, at the time of trial, was recognized as a reasonable defense strategy. See *Nix v. State*, 280 Ga. 141, 143 (3) (b) (625 SE2d 746) (2006). "The fact that present counsel would pursue a different strategy does not render trial counsel's strategy unreasonable. [Cit.]" *Nhek v. State*, 271 Ga. 245, 248 (3) (517 SE2d 521) (1999). Effectiveness of trial counsel is not judged by hindsight or result. *Jackson v. State*, 276 Ga. 94, 96 (6) (575 SE2d 447) (2003).

Similarly, Freeman argues that trial counsel should have conducted a more extensive cross-examination of Stahl, and confronted Stahl with his prior statements that Freeman did not know before the crimes were committed that Stahl intended to rob Dixon. "The scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel." (Footnote omitted.) *Simpson v. State*, 277 Ga. 356, 359 (4) (b) (589 SE2d 90) (2003). Stahl's inconsistency in his various versions of events was addressed on direct examination, and his statements to the police were placed before the jury. Trial counsel testified that he did not consider Stahl to be a believable witness, the weight of the evidence was clearly against Stahl, and counsel's strategy was to try to keep Freeman in the background and avoid responsibility for the crimes. It was not error to deny the motion for new trial on the ground of ineffectiveness of trial counsel.

*Judgments affirmed. All the Justices concur.*

DECIDED JANUARY 26, 2009.

*Cook & Connelly, Bobby Lee Cook, Todd M. Johnson*, for appellant.

*T. Joseph Campbell, District Attorney, Thurbert E. Baker, Attorney General, David A. Zisook, Assistant Attorney General*, for appellee.

S08A1844. LIPSCOMB et al. v. YOUNG.
(672 SE2d 649)

HUNSTEIN, Presiding Justice.

Appellants Demory and Jimmy Lipscomb appeal from the probate court's award of summary judgment in favor of appellee Malinda Young in this challenge to the Last Will and Testament of

the parties' mother, Willie Mae Lipscomb ("testator"). Finding no error in the probate court's disposition, we affirm.

On April 27, 2004, testator executed a will providing, in the event her husband predeceased her, for her entire estate to be left to appellee, one of her daughters. Testator died in June 2007, having been predeceased by her husband. Thereafter, appellee petitioned to probate the will. Appellants filed a caveat, alleging that the will should be invalidated because testator had been under the undue influence of appellee at the time of its execution. Specifically, appellants asserted that testator had previously executed a will that distributed her estate equally among her five children; that she was in a depressed emotional state over her husband's terminal illness at the time she executed the will; that she was vulnerable to appellee's influence as the result of appellee's role in stewarding her health care and finances and assisting with her daily needs; that appellee intimidated testator and often pressured her to acquiesce to her wishes; and that testator had told her sister that she wanted to divide her estate among all her children. Appellants further adduced evidence that appellee drove testator to the appointment at which the will was drafted and executed, was present at its execution, and paid for the will with cash that testator had given her, and further that appellee was the only member of the family who had any knowledge about the existence of the April 2004 will.[1]

"Summary judgment [is] proper only if, construing the evidence most favorably for [appellants], no genuine issue of material fact remains as to whether [t]estator's will was the product of . . . undue influence." *Harper v. Harper*, 274 Ga. 542, 544 (1) (554 SE2d 454) (2001). Undue influence sufficient to invalidate a will "must amount to deception or force and coercion that operates on the testatrix when she is executing her will so that [she] is deprived of free agency and the will of another is substituted for [hers]." (Footnote omitted.) *Smith v. Liney*, 280 Ga. 600, 601 (631 SE2d 648) (2006). "Evidence showing only an opportunity to influence and a substantial benefit under the will does not show the exercise of undue influence. [Cit.]" *Holland v. Holland*, 277 Ga. 792, 793 (2) (596 SE2d 123) (2004).

In this case, there is simply no evidence that appellee exerted any influence whatsoever with respect to the making of the April 2004 will. Though appellee drove testator to her attorney's office and was present when the will was executed, there is no evidence that appellee had any involvement in the decision to create the will or any

---

[1] While appellants also alleged in their caveat that testator had lacked testamentary capacity when executing the will and that the signature appearing on the will was forged, the probate court found both of those allegations to have been abandoned, a finding that appellants do not challenge.

input into its contents.[2] In fact, appellants both testified on deposition that they had no specific evidence indicating that appellee was involved in any way in the drafting of the will. The evidence adduced by appellants regarding appellee's purported intimidation of and threats to testator is likewise devoid of any specific link, temporal or otherwise, to the creation or contents of the will. See *Dean v. Morsman*, 254 Ga. 169, 173 (2) (327 SE2d 212) (1985) (evidence of undue influence over testator at another time will not invalidate will).

Given the absence of evidence that appellee attempted to exert any influence specifically with respect to the will, the fact that testator may have been in a fragile emotional state at the time of the will's execution is of little relevance. Compare *Trotman v. Forrester*, 279 Ga. 844 (621 SE2d 724) (2005) (testator's weakened mental state relevant where beneficiary was directly involved in making of will). Further, despite appellants' efforts to highlight the "confidential relationship" resulting from appellee's role in attending to testator's daily needs, such relationship is of scant probative value on the issue of undue influence given that appellee was, as testator's daughter, a natural object of her bounty. See *Holland*, supra, 277 Ga. at 793 (2) (presumption of undue influence arises where beneficiary maintaining confidential relationship with testator "is not a natural object of the maker's estate"). The fact that testator may have previously executed a will making provision for all five of her children is of no consequence given that the will executed in April 2004 specifically revoked all prior wills, and the evidence to the effect that testator had told her sister she wanted to divide her estate equally among her children is similarly non-probative, not only because there is no evidence as to when such statements were made, but also because such declarations would in any event be inadmissible to prove the exercise of undue influence. See *Harper*, supra, 274 Ga. at 545 (3) ("'declarations of a testator . . . are not admissible to prove the actual fact of . . . an improper influence by another'").

Because appellants failed to come forth with any evidence that appellee attempted to influence the making or the contents of testator's will, the probate court's award of summary judgment to appellee as to appellants' caveat was proper and is hereby affirmed.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 26, 2009.

---

[2] To the contrary, the estate planning lawyer who drafted the will attested by affidavit that appellee was not present during any of his discussions with testator regarding the contents of the will and had no involvement in the planning or preparation of the will.

*McGee & Oxford, Donald L. Cook,* for appellants.
*Orr & Orr, E. Wycliffe Orr, Sr., Spence Johnson,* for appellee.

## S08A1849. BROWN v. THE STATE.
(672 SE2d 651)

CARLEY, Justice.

A jury found David Brown guilty of malice murder. The trial court entered judgment of conviction and sentenced Brown to life imprisonment. Brown filed a motion for new trial, which the trial court denied. Brown appeals, challenging the sufficiency of the evidence supporting his conviction.[*]

Construed most strongly in support of the verdict, the evidence shows that Brown and Kawaski Johnson had an argument while standing in checkout lines inside a Wal-Mart store. A surveillance camera videotape admitted into evidence shows that Johnson left the store first and Brown followed him, putting the bag of items that he had just purchased on the floor before going out the door. The videotape shows that immediately after he left the store, Brown jumped on Johnson from behind and stabbed him with a knife multiple times. Johnson got away from Brown, ran to his car and drove away from the store. Some time later, Johnson drove his car off the roadway, went through a ditch and hit a mobile home. A police officer responded to the accident scene and found Johnson unconscious in the car. Emergency medical personnel arrived and transported Johnson to a hospital, where he was pronounced dead, and a doctor discovered stab wounds on his body. The medical examiner subsequently determined that the cause of Johnson's death was a stab wound to his chest that penetrated his heart and his left lung. Later on the day of the killing, Brown went to the police station and admitted to a detective that he had cut Johnson with his knife, but claimed that he did so only after Johnson first threatened and attacked him. Brown also gave the detective the knife that he used to stab Johnson.

> A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart.