313 Ga. 161
FINAL COPY

S21A0935. SHELTON v. THE STATE.

LaGrua, Justice.

Appellant James Shelton was convicted of malice murder in connection with the death of Manuel "Manny" Palmer.[1] Appellant contends on appeal that (1) the trial court erred in denying his motion for directed verdict and (2) trial counsel was constitutionally deficient for failing to obtain a psychologist's evaluation regarding

---

[1] The crimes occurred on April 28, 2017. On June 29, 2018, a Douglas County grand jury indicted Appellant for malice murder, felony murder, and aggravated assault. At a trial from June 3 to 7, 2019, a jury found Appellant guilty of all counts. The trial court sentenced Appellant to serve life in prison for malice murder and purported to merge the aggravated assault count into the felony murder count. However, the felony murder count was vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372 (4) (434 SE2d 479) (1993). Accordingly, the trial court should have merged Appellant's aggravated assault count into the malice murder count, not the felony murder count. See id. However, this merger error makes no practical difference. See *Marshall v. State*, 309 Ga. 698, 700 (2) (848 SE2d 389) (2020).

Appellant filed a motion for new trial on June 25, 2019, which he amended on January 27, 2020. After a hearing on March 9, 2020, the trial court denied the motion for new trial on January 19, 2021. On February 16, 2021, Appellant filed a notice of appeal to the Court of Appeals, which then transferred the case to this Court on March 23, 2021. The appeal was docketed to the August 2021 term of this Court and submitted for a decision on the briefs.

his criminal responsibility. For the reasons outlined below, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed that Juanita Wix and Palmer were neighbors and that Juanita was Palmer's landlord. On April 28, 2017, Juanita was returning home after dark. As she drove up to her home, she noticed that Palmer's home on Vansant Road was completely dark with its front door ajar. According to Juanita, "this was very out of [Palmer's] usual routine."[2] Thus, at 10:38 p.m., she called the Douglas County Sheriff's Office.

Ten minutes later, the police arrived at Palmer's home and found Palmer inside unconscious on the floor, still breathing but with a roofing hammer protruding from his head. EMTs transported him to the hospital, where he died on May 5, 2017. The medical examiner testified that there were no defensive wounds found on Palmer's body and that the cause of death was sharp-force injury of

---

[2] Juanita testified that Palmer typically would turn on both an internal and an external light around 9:00 p.m., just prior to going to bed with the doors closed.

the head and delayed complications, including intracranial pressure and bleeding. The manner of death was homicide.

Crime scene investigators were unable to identify any fingerprints on the roofing hammer. Clifford Wiley, who occasionally employed Palmer, testified that the roofing hammer found in Palmer's head was the one that he previously gave to Palmer.

On the night of the murder, investigating officers interviewed neighbors, including Juanita and Mary Wix.[3] According to Juanita, she had seen Appellant and Palmer moving scrap metal and other materials to Palmer's home earlier in the day. Stephen Hughes, who worked with Appellant, testified that Appellant and Palmer were good friends who worked together and lived within walking distance of one another. Hughes testified that Palmer would often give Appellant rides because Appellant did not own a car. On the day of the murder, Appellant approached Juanita while he was moving the

---

[3] Juanita and Mary Wix are not related and lived in separate homes in the area.

3

scrap metal with Palmer and asked if he could park a trailer in front of Palmer's home because Appellant was being evicted. Appellant's girlfriend at the time, Cathy Vinyard, later told police officers that Appellant had found an eviction notice on his mobile home, and he wanted to "go up to the courthouse so that he [could] file a notice with the courthouse fighting the eviction."[4] Juanita told Appellant that he could not park the trailer on Palmer's property and that he had to remove the material from in front of Palmer's home.

Mary, who lived next door to Palmer, told police officers that she saw Appellant and Palmer in Palmer's car earlier in the day. She testified that she saw the two of them moving scrap material during the day and placing the material between her house and Palmer's mobile home. She testified that they were moving the material from Appellant's home because Appellant "had to move out." Mary testified that Appellant and Palmer had moved material onto her property before and that she had issues in the past with

_____

[4] Vinyard was not a witness at trial; this fact was established through the testimony of Sergeant Kenneth Aycock, the lead investigator who interviewed Vinyard.

this because it was messy. She approached the two men about this as they were moving material, and she noted that as she approached, they were "fussing" and "arguing." She also saw them haul Palmer's disabled car away on a trailer in order to sell it. Based on this information, the police officers identified Appellant as a person of interest.

Based on information that Appellant and Palmer were scrapping Palmer's car, the police retrieved security video from Alsobrook's Recycling. Security video recordings presented to the jury showed Appellant and Palmer arriving at Alsobrook's at 2:50 p.m. on the day of the murder, scrapping Palmer's disabled car at 3:09 p.m., and receiving money in exchange for the car. Appellant and Palmer then went to the Douglas County Magistrate Court. Court records show that by 4:00 p.m., Appellant had filed an answer and counterclaim to the eviction notice he had received.

Shortly after 5:00 p.m., Appellant and Palmer were seen on a

security video recording from a nearby RaceTrac gas station[5] entering the station's convenience store. Appellant was seen wearing a dark shirt, blue jeans, and dark shoes. The video showed Appellant and Palmer each making purchases around 5:10 p.m. and exiting the convenience store by 5:11 p.m. Crime scene investigators found a RaceTrac receipt in Palmer's car that showed a five-dollar gas purchase made around the time that Appellant and Palmer were seen on the security video at the RaceTrac.

According to Juanita, Palmer came to visit her alone at her home between 5:00 and 6:00 p.m. to drop off some of the money he obtained from scrapping his car.[6] She testified that Palmer told her that he was going to stop talking or associating with Appellant and that he was "giving up the partying lifestyle." Tessa Watkins, a neighbor, testified that Appellant and Palmer frequently drank and partied together at Appellant's home. According to Juanita, Palmer

---

[5] The record indicates that the RaceTrac gas station was between the courthouse and Appellant's home.

[6] Juanita had agreed to sell a truck to Palmer, for which Palmer would pay her whenever he could.

informed her during their conversation that he was either going to tell or had already told Appellant of his intention to stop associating with him.[7] At the end of their conversation, which lasted about an hour, Palmer told her that he was going to stop by Ingles.

Around 6:45 p.m., Palmer was seen in a security video recording from a nearby Ingles store making a purchase. Crime scene investigators found an Ingles receipt in Palmer's yard and unopened groceries from Ingles on the floor in Palmer's home. According to the Ingles receipt, a variety of groceries was purchased at 6:55 p.m.

Around 7:00 p.m., William Watkins, a neighbor of Palmer's, saw him returning to his home carrying Ingles bags. Palmer was not seen again until the police found him after the assault.

A security video recording from Sheehan Metal Products, which is within walking distance of Palmer's home, recorded

---

[7] At trial, Juanita testified that Palmer "said that he was going to tell" Appellant about his desire to stop partying with Appellant. But during her police interview in the month after the crime, she told police that Palmer had already communicated this to Appellant by the time they spoke that afternoon.

Appellant walking on Vansant Road toward Palmer's home at 7:20 p.m.[8] In the security video, Appellant is seen wearing the same dark shirt, blue jeans, and dark shoes that he was wearing in the RaceTrac convenience store.

The Smith family — husband and wife Brandon and Brooke, and Brandon's brother Dylan — lived together in a mobile home that they rented from Appellant; they lived about 100 yards away from where Appellant lived. Brandon and Brooke were at home when Appellant showed up at their home around 6:00 p.m., drunk and weeping. Appellant stated that he was going to die and that doctors told him he had only six months to live. According to Brooke, Appellant stayed for about 30 to 40 minutes and then left. Appellant was not at the house when Brooke left for work around 8:00 or 9:00 p.m., and she did not see Appellant again until the next day. However, Brandon testified that Appellant was at the Smith home when he went to sleep around 11:00 p.m.

---

[8] The timestamp on the recording was 7:04 p.m., but two witnesses testified that the timestamp on the security video was 16 minutes behind real time.

Dylan saw Appellant and Palmer together on the day of the murder and testified that the two seemed "normal" at the time. When Dylan later returned to the Smith home between midnight and 1:00 a.m., he found Appellant sleeping on the floor inside Dylan's room. Appellant told Dylan that someone was looking for him, which Dylan understood to mean law enforcement.

The next morning, when Brandon awoke around 10:30, Appellant was still at the Smith home. Appellant then left for about five or ten minutes, and when he returned, he asked Brandon to take him to the hospital. Appellant did not tell Brandon why he needed to go to the hospital. Appellant also asked Dylan if he could borrow some clothes, and Dylan lent Appellant a pair of brown shorts.

Brandon took Appellant to the hospital around 1:00 p.m. A security video recording from the WellStar Hospital in Douglasville showed Appellant in a white shirt, brown shorts, black shoes, and a hat entering the emergency room front desk area at 1:38 p.m.

Two days later, a Douglas County Sheriff's deputy was at the hospital for an unrelated matter. The deputy — who had received

9

an e-mail that included a picture of Appellant and named him as a person of interest — saw Appellant in the hospital's psychiatric ward and notified Sergeant Kenneth Aycock, who was leading the investigation into Palmer's murder.

Aycock went to the hospital on the same day to interview Appellant. Aycock testified that he asked Appellant "if he had heard about his friend getting hurt," and Appellant "stated no without asking [Aycock] or even knowing who [Aycock] was talking about." Aycock then told Appellant that he was referring to Palmer. Appellant told Aycock that the last time he saw Palmer was when they scrapped Palmer's car. He said that he and Palmer then went to the courthouse to file the counterclaim to Appellant's eviction notice. Appellant told Aycock that he and Palmer then returned to Appellant's home and that Palmer left after "a short period of time." Appellant told Aycock that he then went to the Smith home for the remainder of the night and stayed until the next day. Aycock noted that during this interview, Appellant was very talkative when discussing fishing and other topics, but "just got quiet every time

[Aycock] asked him a direct question about Palmer."

Aycock obtained a search warrant for Appellant's personal belongings that he had at the hospital, as well as for Appellant's DNA. He retrieved Appellant's clothing and cell phone from hospital staff and obtained a buccal swab from Appellant to test for Appellant's DNA. Aycock recovered brown cargo shorts, black shoes, a belt, and a hat.[9] Aycock also obtained and executed a search warrant for Appellant's home, seeking clothing either matching what Appellant was wearing in security camera footage or containing bloodstains. Aycock retrieved a black shirt, black shoes, and a pair of jeans. Palmer's DNA was not found on any clothing recovered either from the hospital or from Appellant's home.

Aycock also submitted Appellant's cell phone to a forensics lab. The data extracted from the phone showed that Appellant's phone made several calls on the night that Palmer was killed. At 7:01 p.m., Appellant's phone called Palmer's phone, and the phone call lasted

---

[9] The white shirt that Appellant was seen wearing in the hospital security video recording was not recovered.

58 seconds. At 7:05 p.m., Appellant's phone made an 18-second phone call to Hughes, who testified that Appellant told him during the call that he was being evicted and was "sort of disturbed about it." At 7:06 p.m., Appellant's phone called a phone number associated with a man named Larry Pierce; this phone call did not connect. Finally, at 7:10 p.m., Appellant's phone placed a 19-second call to Palmer's phone. After this call, Appellant's phone was turned off, and no other phone calls were made. When Aycock recovered Appellant's phone from the hospital two days later, the phone was still turned off. The cell tower information from the phone calls made between 7:01 and 7:10 p.m. placed Appellant within the area of his home and Sheehan Metal Products. The evidence at trial showed that calls made from Appellant's cell phone during this time would have pinged off the same cell phone tower regardless of whether they were placed at Palmer's home, Appellant's home, or the Smith home.

On May 15, two weeks after Aycock's interview with Appellant at the hospital, Aycock encountered Appellant at the Douglas

County courthouse, where Appellant was appearing for proceedings related to his eviction. Aycock asked Appellant to return with him to the police station. At the police station, Aycock interviewed Appellant, and Appellant repeated his previous alibi that he was at the Smith home all of Friday night. By this time, the police had obtained and reviewed the surveillance video from Sheehan Metal Products, which showed Appellant walking down Vansant Road toward Palmer's home at 7:04 p.m.

During the interview, Aycock asked about the clothes that Appellant was wearing on the night of the murder and why Appellant had asked to borrow clothes from Dylan on the morning that Appellant visited the hospital. Appellant had no explanation about what happened to the clothes he was wearing on the night of the murder. Aycock also asked whether Appellant knew why Palmer's blood had been found on Appellant's shoes.[10] Appellant responded that Palmer had cut his finger while in Appellant's yard and blood splattered on his shoes. Aycock then asked Appellant

[10] Palmer's blood was not actually found on Appellant's shoes.

13

what he knew about Palmer's death. Appellant explained that he heard that Palmer was "robbed and left in a ditch," that Vinyard had told him that Palmer had been hit in the head with something, and that he understood police to be looking for a murder weapon "like a machete or a hammer." After this line of questioning, Appellant said he needed to take a smoke break and left the room for about 12 minutes. After he returned, Aycock continued the interview for about 15 minutes. Toward the end of the interview, Aycock began to inquire into Appellant's mental health, at which point Appellant ended the interview and left.

The police continued the investigation, and on June 8, 2018, more than a year after Palmer's death, an arrest warrant for Appellant was issued. Police officers contacted Appellant's family members to determine his whereabouts. On June 9, police officers discovered that Appellant had been admitted into a Paulding County hospital for a psychological evaluation. Appellant was arrested at the hospital.

After Appellant was arrested, Aycock obtained and executed a

search warrant for Appellant's complete medical history. According to Aycock, Appellant's medical records showed that on April 29, 2017, the day after Palmer was attacked, Appellant checked into the WellStar Douglasville hospital for neck, back, and wrist pain, claiming that he fell out of the back of a pickup truck. The medical records did not show evidence of any injury, but when Appellant was going to be discharged, he refused and stated that he would "jump out in front of a car" if he was discharged. Doctors placed Appellant on suicide watch and transferred him to Cobb Behavioral Health Crisis Center. He was later discharged. The medical records also show that on May 19, 2017, four days after Aycock encountered Appellant at the courthouse and interviewed him at the police station, Appellant checked into a hospital stating that he was "feeling depressed, not in his right mind, and that he would walk out in front of traffic." Aycock also testified that on June 9, 2018, one day after police officers called Appellant's family to pursue his arrest warrant, he checked into the hospital stating that he was going to commit suicide.

2. Appellant first contends that the trial court erred when it denied his motion for a directed verdict of acquittal at the close of the State's evidence. He argues that the evidence presented was insufficient to establish the elements of malice murder because the evidence failed to place Appellant at the crime scene. We disagree.[11]

A court may direct a verdict of acquittal where there is no conflict in the evidence and, with all reasonable deductions and inferences, the evidence demands a verdict of acquittal. See OCGA § 17-9-1 (a). "The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction." *Fitts v. State*, 312 Ga. 134, 141 (3) (859 SE2d 79) (2021). Under that standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

---

[11] Appellant's challenges to the guilty verdicts on his felony murder and aggravated assault counts are moot because, as outlined in footnote 1 above, those counts were vacated or merged. See *Kemp v. State*, 303 Ga. 385, 388 (1) (a) n.2 (810 SE2d 515) (2018).

16

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis in original); see also *Thompson v. State*, 302 Ga. 533, 536 (II) (807 SE2d 899) (2017).

Upon review, the evidence presented in this case was sufficient to sustain Appellant's conviction for malice murder. The jury was authorized to find that Appellant was seen with Palmer throughout the afternoon of the murder; was arguing and became upset with Palmer on that day; called Palmer and several others, in an agitated state, around the time that Palmer was last seen alive; made a final call to Palmer before turning his phone off; feared capture by police on the night of Palmer's murder; changed clothes after believing someone was looking for him; and was engaging with police during his interview except when asked about Palmer's murder, at which point Appellant became quiet or nonresponsive.

Further, the jury was entitled to disbelieve Appellant's claim that he remained at the Smith home for the entirety of the evening of the murder. Security recordings from Sheehan Metal Products showed Appellant walking toward Palmer's house around the time

17

that Palmer was last seen alive and after Appellant first appeared at the Smith home. And although Brooke and Brandon confirmed that Appellant came to their home around 6:00 p.m., Brooke also testified that Appellant left the home about 30 minutes later. Thus, the jury was authorized to believe that Appellant was not only walking toward Palmer's home around the time that Palmer was last seen alive, but also that he repeatedly lied about it to the police when he was interviewed.

Taken together, we conclude that the evidence was sufficient to authorize the jury to find Appellant guilty of the crimes for which he was convicted. See *Sapp v. State*, 300 Ga. 768, 770 (798 SE2d 226) (2017) (evidence was sufficient to deny motion for directed verdict where appellant was seen in a security camera recording near where the victim was found, and appellant appeared nervous and sweaty and changed clothes after the murder). Accordingly, the trial court did not err in denying Appellant's motion for directed verdict, and this enumeration fails.

3. Appellant next contends that his trial counsel provided

constitutionally ineffective assistance by failing to pursue a psychological evaluation that would determine Appellant's criminal responsibility at the time of the crime. This enumeration fails.

(a) Appellant was represented by lead trial counsel Christian Bonet and co-counsel James Kiger. Prior to trial, trial counsel requested, and the trial court entered, an order for a psychological evaluation to determine (1) Appellant's competency to stand trial and (2) Appellant's criminal responsibility or sanity at the time of the crime. A licensed psychologist from the Georgia Department of Behavioral Health and Developmental Disabilities ("DBHDD") began that evaluation on July 31, 2018.

During the evaluation, Appellant told the evaluator that he had attention-deficit hyperactivity disorder and memory problems; that he had been "physically, mentally, and sexually abused"; that he had a history of suicide attempts and self-injurious behavior since he was nine years old; and that he experienced both depressive and psychotic symptoms. Appellant claimed that he heard voices and noises that others did not hear, but "when [the evaluator] asked to

19

provide an example, he stated, 'I'm not answering because you gave me the option not to,' . . . [and] he spontaneously stated, 'I see things like an aura around people when no one is there . . . in the air. Right now I'm seeing the static channel.'" Appellant also stated during the evaluation that he often "smell[ed] colors."

When reviewing Appellant's mental health history, the evaluator determined that Appellant had been admitted to a hospital three times since 1991 for mental health reasons. But the evaluator also noted that Appellant's description of his mental symptoms at the time of the court-ordered evaluation was not typical and that his descriptions were "inconsistent with his history and observed general functioning." The evaluator administered the Miller-Forensic Assessment of Symptoms Test "to assess whether [Appellant] was exaggerating/feigning his symptoms." The results indicated that he was "likely falsely reporting symptoms of mental illness."

During the competency portion of the evaluation, Appellant was able to describe, define, and understand various aspects of

20

court, the adversarial nature of legal proceedings, and certain legal terms (such as guilty, not guilty, plea bargain, and evidence). The evaluator also explained the not guilty by reason of insanity ("NGRI") defense to Appellant. See OCGA §§ 16-3-2[12] and 16-3-3.[13] Appellant understood that the defense meant "you did it but didn't know it because you were not in your right mind [due to a mental illness]." Appellant also stated that the defense "was an alternative to resolving his case but wanted to discuss this with his attorney prior to considering this defense." Accordingly, the evaluator did not proceed with the second portion of the evaluation that would have assessed Appellant's criminal responsibility at the time of the crime.

The evaluator ultimately concluded that Appellant was competent to stand trial but made no conclusion as to Appellant's

---

[12] OCGA § 16-3-2 provides: "A person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence."

[13] OCGA § 16-3-3 provides: "A person shall not be found guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime."

criminal responsibility. However, she noted that "[i]f Mr. Shelton plans to pursue an NGRI defense, I respectfully request DBHDD be notified so the [criminal responsibility] evaluation can be scheduled." Appellant's trial counsel did not reach out to the evaluator again about the criminal responsibility portion of the evaluation, and Appellant now asserts that this amounted to ineffective assistance of counsel.

(b) To prevail on a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Valentine v. State*, 293 Ga. 533, 537 (3) (748 SE2d 437) (2013). To prove deficiency, Appellant must show that his counsel "performed [their] duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms." *Valentine*, 293 Ga. at 536 (3). To prove prejudice, Appellant must show "a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 443 U. S. at 694 (III) (B). If an appellant fails to meet the burden of proving either prong of the *Strickland* test, we need not examine the other prong. See *Sullivan v. State*, 308 Ga. 508, 510 (2) (842 SE2d 5) (2020). We conclude that Appellant has failed to show prejudice.

Even assuming that trial counsel performed deficiently by failing to pursue a psychological evaluation that indicated Appellant's criminal responsibility at the time of the crime, Appellant has failed to show that any such deficiency would have prejudiced his case. "In Georgia, a defendant is presumed to be sane." *McElrath v. State*, 308 Ga. 104, 106 (1) (b) (839 SE2d 573) (2020) (citation and punctuation omitted). Further, "[t]he burden is on the defendant to show that he has a mental condition that should have been investigated and offered as proof of a defense to criminal liability or of his incompetence to stand trial." *Valentine*, 293 Ga. at 537 (3) (citation and punctuation omitted). "It is not enough to show

merely that counsel unreasonably failed to inquire into [Appellant's] mental state — he must show a reasonable probability that such an evaluation would have affected the outcome at trial." Id. (citation and punctuation omitted).

While the psychological evaluator noted that Appellant claimed a history of mental health problems and delusions during his psychological evaluation, the psychological evaluator also determined that Appellant was likely feigning mental health illness symptoms. Also, Appellant failed to present any evidence at the motion for new trial hearing indicating that Appellant was in fact suffering from mental illness at the time of the crime such that he would be able to avoid criminal responsibility. See *Valentine*, 293 Ga. at 537 (3) (the appellant "presented no expert testimony showing what a pretrial evaluation could have revealed which would have been favorable to the defense had counsel requested one" (citation and punctuation omitted)). Therefore, Appellant has failed to establish that there is a reasonable probability that the result of his trial would have been different had his trial counsel requested an

evaluation regarding his criminal responsibility at the time of the crime. See *Mims v. State*, 304 Ga. 851, 855-856 (2) (a) (823 SE2d 325) (2019) ("Mims has not shown what the result of any additional examination would have been, and thus fails to show that the result of her trial would have been different if such an evaluation had been pursued."). Accordingly, this enumeration of error fails.

*Judgment affirmed. All the Justices concur.*

Decided February 15, 2022.

Murder. Douglas Superior Court. Before Judge McClain.

*Jones Federal & Appellate, Nicole Jones*, for appellant.

*Dalia Racine, District Attorney, Jeffrey M. Gore, Aimee F. Sobhani, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.