**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: December 19, 2023

S23A0893. WATERS v. THE STATE.

LAGRUA, Justice.

Appellant Roy Lee Waters was found guilty but mentally ill of felony murder in connection with the shooting death of Melvina Dunlap.[1] On appeal, Waters contends that the evidence was insufficient to support his conviction, the trial court erroneously denied Waters's motion for a new trial on the "general grounds," and his trial counsel provided constitutionally ineffective assistance by

---

[1] The crimes occurred on November 25, 2013. On February 20, 2014, a Laurens County grand jury indicted Waters for malice murder (Count 1), felony murder (Count 2), and two counts of aggravated assault (Counts 3 and 4). At a trial in September 2019, the jury acquitted Waters of malice murder and found him guilty but mentally ill on the remaining charges. The trial court merged the two counts of aggravated assault into the felony murder count and sentenced Waters to serve life in prison with the possibility of parole. Waters filed a timely motion for new trial, which was amended through new counsel. After holding an evidentiary hearing, the trial court denied the motion for new trial on March 30, 2023. Waters filed a timely notice of appeal, and his case was docketed to this Court's August 2023 term and submitted for a decision on the briefs.

1

failing to further investigate Waters's insanity defense. For the reasons that follow, these claims fail, and we affirm Waters's conviction.

The evidence presented at trial showed that in the early morning hours of November 25, 2013, Waters, who was around 72 years old at the time, shot and killed Dunlap, his longtime girlfriend, in their shared bedroom. After the shooting, Waters admitted in calls he placed to his pastor and one of his brothers that he shot Dunlap. In a call placed to another brother, Waters said, "[S]omething happen[ed]," and that he was "in trouble."

An ambulance responded to the home of Waters and Dunlap based on "a medical call." When the EMT entered the home, Waters directed the EMT to the back bedroom, stating, "I shot her." The EMT discovered Dunlap's body in the bedroom, and the medical examiner later determined that Dunlap's cause of death was three gunshot wounds to the face and torso.

Shortly after the ambulance arrived, a sheriff's deputy entered the home and asked Waters, who was reading the Bible, what

happened; Waters responded that he "had been dealing with them for a while." Police recovered a Rossi .32-caliber pistol and four shell casings from the floor of the bedroom. Waters was arrested, and a gunshot residue test was performed on his hands; it was positive for the presence of gunshot residue. After Waters was read his *Miranda*[2] rights, he agreed to speak with police. In Waters's interview, he admitted that he shot Dunlap, but he struggled to explain why he had done so. Waters stated that he and Dunlap had gone to church the previous morning and "something happened in church and [he] couldn't figure out what it was," but "it was eating [him] up and tearing [him] up." Waters later stated that he shot Dunlap because she "did [him] wrong" by refusing to marry him and that he did not want to hurt her.

At trial, Waters asserted an insanity defense. During its case-in-chief, the State presented Dr. Elliott Currence, a forensic psychologist at Central State Hospital, as an expert in the field of forensic psychology, and he was admitted as an expert without

[2] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

3

objection. Dr. Currence testified that he evaluated Waters to determine whether he was criminally responsible at the time of the act, which Dr. Currence explained was an assessment to determine a person's mental state at the time of the alleged crime. Dr. Currence explained that for a person to be found insane or not criminally responsible at the time of the act, mental illness symptoms "have to be severe enough to result in an inability to know that what you're doing is wrong or you're so mentally ill that you're not able to control your behavior; you have a delusional compulsion." Dr. Currence elaborated that for such people the "illness is so severe that they have no idea that what they're doing is wrong or they have an inability to stop themselves from doing it."

Dr. Currence noted that Waters "ha[d] a history of outpatient treatment for schizophrenia before [the shooting]." After the shooting, Waters was "psychiatrically hospitalized" at Central State Hospital, documented as "being paranoid," and later discharged with diagnoses of schizophrenia and alcohol dependence.

Dr. Currence interviewed Waters twice. Regarding the

4

shooting, Waters stated, "I don't know what happened when I shot [Dunlap], I was home, she was there, and the next thing I just had a gun in my hand and she was shot." Waters further explained: "After [Dunlap] was shot, I called my brother and I called a pastor. I just wanted to call my people and let them know that something bad happened. I know I needed help and I guess maybe they could help me." Dr. Currence testified that these phone calls after the shooting were "indicative of [Waters's] awareness of wrongfulness." Dr. Currence also testified that Waters's lack of a clear memory of what occurred was "not uncommon" among people with and without a history of mental illness.

When Dr. Currence asked Waters whether he had any previous mental health issues, Waters responded that he had "bad nerves," for which he was prescribed medication. According to Dr. Currence, Waters did not describe any delusions and he did not appear to have any irrational thoughts. Dr. Currence stated that Waters was cooperative and understood that his behavior had been "problematic." In Dr. Currence's opinion, Waters was criminally

5

responsible at the time of Dunlap's shooting.

In Waters's defense, he presented the testimony of his pharmacist, who testified that he filled numerous prescriptions for Waters in the month prior to the shooting. The pharmacist listed Waters's prescriptions and noted the reason they were generally prescribed. The pharmacist was not admitted as an expert, and he testified:

> The risperidone is generally used as antipsychotic. Clonazepam [is] an antianxiety agent. Paroxetine is [an] antidepressant. Pantoprazole is generally used for reflux disorders or stomach ulcer[s]. Isosorbide is a heart medication, usually to treat angina. Lisinopril [is] usually used for blood pressure . . . Donepezil is used to treat Alzheimer's or some type of dementia disorder. Hydrochlorothiazide is a diuretic which is used for fluid retention and blood pressure . . . Tamsulosin is for used prostate problem to increase urine flow.

During Dr. Currence's testimony, he stated that risperidone is commonly prescribed to treat schizophrenia and clonazepam is used in the treatment for mental illness.

Reverend Don Edwards testified that Waters attended church approximately fifteen hours prior to the shooting and he appeared

upset and was crying. Because that was not Waters's "normal character," Edwards went over to comfort Waters, but Edwards was unable to have a conversation with Waters because it was in the middle of the church service. Waters's son testified that Waters came to see him after church and Waters was "keyed up," "sweating," and "concerned about how [his son] was doing." Waters's son stated that he had never seen his father act that way before.

Waters's two brothers and his son testified that they knew Waters had previously spent time at Central State Hospital for "emotional" or "mental problems" and that Waters took medication for his "bad nerves." One brother testified that when Waters was taking an unspecified medication, he would become disoriented and "wasn't his real self." Waters's son testified that he had previously witnessed a time when Waters "could barely walk" and "was almost about to crawl coming in the house." But Waters's son was not sure whether Waters had taken too much medication or not enough on that occasion.

Waters took the stand in his own defense. Waters stated that

he usually took his medication as prescribed, but that he did not take his medication on the weekend of the shooting because overall he "fe[lt] like [he] took too much medicine" so he "backed off of it." Waters explained that he started "feeling bad" on the Sunday morning that he went to church and stated, "I just—I couldn't be myself," and that he felt worse upon leaving church that day. When asked whether he shot Dunlap, Waters said, "I don't know what happened" and "I can't remember." But Waters admitted that he told people that he shot Dunlap. Waters further stated that he had not argued with Dunlap prior to the shooting and that he did not have any thoughts about hurting or killing her.

1. Waters contends the trial court erred in denying his motion for new trial because the evidence presented at trial was insufficient to support his conviction for felony murder. We disagree.

Evidence is constitutionally sufficient to support a conviction if, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Munn v. State*,

8

313 Ga. 716, 720 (1) (873 SE2d 166) (2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). "This Court does not reweigh evidence or resolve conflicts in testimony but rather defers to the jury's assessment of the weight and credibility of the evidence." *Jones v. State*, 314 Ga. 692, 695 (878 SE2d 502) (2022) (citation and punctuation omitted).

The evidence summarized above, including Waters's admission that he shot Dunlap, the presence of gunshot residue on his hands after the shooting, and the recovery of a handgun and shell casings in the room where Waters directed the EMT to locate Dunlap's body, was sufficient to authorize the jury to find beyond a reasonable doubt that Waters was guilty of felony murder based on aggravated assault. The jury was also authorized to reject Waters's insanity defense based on its assessment of the credibility of the witnesses and of any conflicts in the evidence, including Dr. Currence's testimony that Waters was criminally responsible at the time of Dunlap's shooting. See *Choiset v. State*, 295 Ga. 568, 571 (1) (761 SE2d 322) (2014) (courts must also determine whether the jury was

9

authorized to reject an insanity defense when asserted). See also *Neuman v. State*, 311 Ga. 83, 86 (1) (856 SE2d 289) (2021). Thus, Waters's sufficiency claim fails.

2. Waters also appears to contend that the trial court erred in denying his motion for new trial based on the "general grounds" under OCGA §§ 5-5-20[3] and 5-5-21.[4] "When these so-called 'general grounds' are properly raised in a timely motion for new trial, the trial judge must exercise a broad discretion to sit as a 'thirteenth juror.'" *King v. State*, 316 Ga. 611, 616 (2) (889 SE2d 851) (2023) (citing *Ridley v. State*, 315 Ga. 452, 456 (3) (883 SE2d 357) (2023)). "This role requires the judge to consider matters typically reserved to the jury, including conflicts in the evidence, witness credibility, and the weight of the evidence." *Ridley*, 315 Ga. at 456 (3). But "the merits of the trial court's decision on the general grounds are not

---

[3] OCGA § 5-5-20 provides that "[i]n any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity, the judge presiding may grant a new trial before another jury."

[4] OCGA § 5-5-21 provides that "[t]he presiding judge may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding."

subject to our review, and the decision to grant a new trial on the general grounds is vested solely in the trial court." *King*, 316 Ga. at 616 (2) (citation and punctuation omitted).

To the extent Waters contends the trial court failed to exercise its discretion as the thirteenth juror, we disagree. In its order denying Waters's motion for new trial, the court expressly rejected Waters's general grounds claim because it found that "the verdict [was] not contrary to the law and principles of justice" and that "the weight of the evidence supported the verdict and the verdict was consistent with the principles of justice and equity." Waters's general grounds claim therefore fails. See *King*, 316 Ga. at 616 (2) (concluding the trial court properly exercised its discretion as the thirteenth juror when "[i]n its order denying [the defendant's] motion for a new trial, the court expressly rejected [the defendant's] general grounds claim because it found that 'the weight of the evidence does not preponderate heavily against the verdict and the verdict was not contrary to the evidence or the principles of justice and equity'"). To the extent a sufficiency analysis is required for a

11

general grounds claim, see *King*, 316 Ga. at 617 (2) n.8, we concluded in Division 1 that the evidence against Waters was constitutionally sufficient to affirm his conviction, so his claim fails for this additional reason.

3. Waters contends his trial counsel provided constitutionally ineffective assistance because counsel failed to adequately investigate Waters's insanity defense by failing to procure an expert to testify about Waters's criminal responsibility at the time of Dunlap's shooting and failing to procure an expert to testify about the side effects of Waters's prescription medications. These claims fail.

(a) *Background*

(i) *Pretrial Competency Evaluations*

Soon after Waters's arrest, trial counsel moved to have Waters examined for his competency to stand trial, and this motion was granted. Following a bench trial a couple of weeks later, the trial court determined that Waters was not competent to stand trial, and he was remanded to the custody of the Georgia Department of

12

Behavioral Health and Developmental Disabilities, i.e., Central State Hospital, for treatment.

Fifteen months later, on March 3, 2015, a psychologist at Central State Hospital "recommend[ed] that [Waters] be found competent to stand trial." Approximately two weeks later, Waters was released on bond, with instructions that he comply with all medical directives.[5] In September 2015, trial counsel filed Waters's first notice of intent of defense of insanity. See Uniform Superior Court Rule 31.5 (A).

On February 16 and August 24, 2016, the trial court ordered that Waters be evaluated for his criminal responsibility at the time of the act.[6]

Following a hearing on June 8, 2018,[7] the trial court found that rehabilitation of Waters's competency was required and ordered

---

[5] The record does not explain what happened between the time the psychologist "recommend[ed]" that Waters be found competent to stand trial and when he was released on bond, e.g., whether there was a competency hearing.

[6] It appears this evaluation was not completed until 2019.

[7] It is not clear from the record as to what occurred during the preceding two years, except that status hearings were scheduled in May, September, October, and November 2017.

13

that he be transported to Central State Hospital for a competency evaluation and, if appropriate, treatment. In an amended order, the trial court noted that two psychologists determined that Waters was not competent to stand trial and one psychologist determined that Waters was competent to stand trial and "described an alleged history of feigning."

On January 2, 2019, the trial court held a competency hearing and received testimony from Dr. Currence. Following this hearing, the trial court entered an order, finding Waters was competent to stand trial and ordering that Waters be evaluated for his criminal responsibility at the time of the act.

(ii) *Pretrial Criminal Responsibility Evaluation*

In May 2019, following receipt of Dr. Currence's report, the trial court held a hearing and entered an order, determining that Waters "had the mental capacity to distinguish right from wrong in relation to the alleged acts and that [Waters] was not under the influence of a delusional compulsion which would overmaster his will to resist committing the alleged acts." Waters then filed his

14

second notice of intent of defense of insanity.

(iii) *Waters's Motion for New Trial*

At the motion-for-new-trial hearing, trial counsel testified that his trial strategy was to pursue an insanity defense, and counsel was aware that Dr. Currence planned to testify that Waters was criminally responsible at the time he shot Dunlap. In response to Dr. Currence's anticipated testimony, counsel "reach[ed] out to . . . psychiatrists" "that [he] had confidence in," including the head of psychiatry at Emory University, and counsel "ran the factual basis by them and asked their professional opinion." According to counsel, the answer he received was that an insanity defense was "not going to work," so counsel decided not to hire a psychologist or psychiatrist. Counsel testified that his "greatest fear" was for Waters to undergo another examination and have that examination confirm Dr. Currence's opinion, resulting in "an additional witness against" Waters.

While trial counsel recognized that he "did not have any witnesses to prove the legal trial strategy [of insanity]," he stated

15

that he presented witness testimony from which jurors "could reach their own conclusion as to whether" Waters was criminally responsible at the time he shot Dunlap. These witnesses included Waters's family members, Reverend Edwards, and Waters's pharmacist. Counsel acknowledged that the pharmacist's inability to testify about the side effects of Waters's medications on his mental stability was "a problem" and that it would have been helpful "to find a witness that could say the medications might have impacted his mental stability."

The trial court denied Waters's claims of ineffective assistance of counsel, finding that "trial counsel's representation did not fall below the standard of reasonable professional conduct" and that there was "no evidence the outcome [of the trial] would have been impacted by an expert witness's testimony regarding the medications taken by [Waters] at the time of the incident," i.e., the trial court concluded the claims failed on both deficiency and prejudice grounds.

(b) *Analysis*

16

To prevail on claims of ineffective assistance of counsel, Waters must demonstrate both that his trial counsel's performance was professionally deficient and that he was prejudiced by this deficient performance. See *Bates v. State*, 313 Ga. 57, 62 (2) (867 SE2d 140) (2022) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To establish deficient performance, Waters must show that trial counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. Establishing deficient performance

> is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably, and [the appellant] bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Park v. State*, 314 Ga. 733, 740-741 (879 SE2d 400) (2022) (citation and punctuation omitted). To establish prejudice, Waters must

prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different. See *Bates*, 313 Ga. at 62 (2). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (citation and punctuation omitted). "And, this burden is a heavy one." Id. at 62-63 (2) (citation and punctuation omitted). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Taylor v. State*, 315 Ga. 630, 647 (5) (b) (884 SE2d 346) (2023) (citation and punctuation omitted).

(i) *Failure to Procure Expert to Testify About Waters's Criminal Responsibility at the Time of Dunlap's Shooting*

Waters contends his trial counsel provided constitutionally ineffective assistance because counsel failed to adequately investigate Waters's insanity defense by failing to procure an expert to testify about Waters's criminal responsibility at the time of Dunlap's shooting. We agree with the trial court that counsel was not deficient.

18

"Typically, the decision whether to present an expert witness is a matter of trial strategy that, if reasonable, will not sustain a claim of ineffective assistance." *Guzman-Perez v. State*, 310 Ga. 573, 577 (2) (853 SE2d 76) (2020) (citation and punctuation omitted). We have explained that when trial counsel makes a strategic decision not to continue searching for a defense expert, but instead challenges the State's expert on cross-examination, while also presenting a robust defense to other aspects of the State's case, counsel's decision is not unreasonable and does not constitute deficient performance. See *Bates*, 313 Ga. at 67 (2) (d).

Here, Waters has failed to show that his trial counsel was deficient for failing to further investigate Waters's insanity defense by procuring an expert to testify about Waters's criminal responsibility at the time of the shooting. As shown above, trial counsel testified that he "reach[ed] out" to a few psychiatrists "that [he] had confidence in," including the head of psychiatry at Emory University, and he "ran the factual basis by them and asked their professional opinion." According to counsel, the answer he received

19

was that an insanity defense was "not going to work." Because of this response, counsel felt that obtaining an expert "wasn't going to be constructive." Instead, counsel presented fact witnesses from which jurors "could reach their own conclusion as to whether" Waters was criminally responsible at the time he shot Dunlap. Thus, "this is not a case where trial counsel made no effort to investigate the potential for a defense based on mental health issues or relied exclusively upon his own lay evaluation of the mental health of his client," *Sullivan*, 308 Ga. at 514 (2) (b) (citation and punctuation omitted), and counsel presented evidence to support an insanity defense through fact witnesses, including witnesses who described Waters's behavior prior to the shooting and explained the medications he was taking and why they were generally prescribed.

Therefore, we cannot conclude that the investigation by and tactical judgment of Waters's trial counsel was objectively unreasonable. See *Bates*, 313 Ga. at 67-68 (2) (d) (concluding that trial counsel did not perform deficiently by failing to present an expert to rebut the State's expert on the defendant's mental state at

20

the time of the shooting). Cf. *Taylor v. State*, 315 Ga. 630, 648-649 (5) (c) (884 SE2d 346) (2023) (concluding that trial counsel did not perform deficiently by failing to further investigate an insanity defense where the expert who performed the defendant's psychiatric evaluation concluded that the defendant was competent to stand trial and was competent at the time of the offense). Accordingly, this claim fails.

(ii) *Failure to Procure Expert on Medications*

Waters contends his trial counsel provided constitutionally ineffective assistance because counsel failed to adequately investigate Waters's insanity defense by failing to procure an expert to testify about the side effects of Waters's prescription medications. Assuming without deciding that counsel was deficient, we conclude Waters has failed to establish prejudice.

It is well established that a defendant fails to establish prejudice under *Strickland* when he merely contends that trial counsel was deficient for failing to present an expert, without also presenting evidence at the motion-for-new-trial hearing about what

21

the potential expert would have testified to at trial. See, e.g., *Allen v. State*, 317 Ga. 1, 10 (4) (a) (890 SE2d 700) (2023) (concluding that the appellant failed to show prejudice when he "failed to present at the motion for new trial stage any expert testimony or other evidence indicating that he has in fact suffered from mental illness at any point, let alone at the time of the crime such that he would be able to avoid criminal responsibility or at the time of trial such that he would be incompetent to stand trial"); *Shelton v. State*, 313 Ga. 161, 171 (2) (b) (869 SE2d 377) (2022) (same when the appellant "failed to present any evidence at the motion for new trial hearing indicating that [the appellant] was in fact suffering from mental illness at the time of the crime such that he would be able to avoid criminal responsibility"); *Mims v. State,* 304 Ga. 851, 856 (2) (a) (823 SE2d 325) (2019) (same when the appellant "did not present any evidence [at the motion-for-new-trial hearing] that she had ever been evaluated by an expert or that a psychologist reviewed the record and formed an opinion as to her culpability at the time of the offense"). This is because "mere speculation about what the evidence

22

would have shown had it actually been obtained does not satisfy the requirement of showing prejudice." *Coley v. State*, 305 Ga. 658, 666 (6) (b) (827 SE2d 241) (2019).

Here, Waters failed to present any evidence at the motion-for-new-trial hearing about what evidence could have been elicited from a potential expert testifying about the side effects, if any, of Waters's prescription medications. Waters therefore has not shown that a reasonable probability exists that the result of the trial would have been different had trial counsel attempted to retain an expert on the potential side effects of Waters's prescription medications. See *Coley*, 305 Ga. at 665 (6) (b). As a result, this claim of ineffective assistance fails.

4. To the extent Waters contends that the combined prejudicial effect of trial counsel's deficiencies affected the outcome of the trial, see *Schofield v. Holsey*, 281 Ga. 809 (642 SE2d 56) (2007), we have stated that a defendant must show "that the cumulative prejudice from any assumed deficiencies . . . showed a reasonable probability that the results of the proceeding would have been different in the

absence of the alleged deficiencies." *Allen*, 317 Ga. at 13 (4) (f). For the purposes of this analysis, we have assumed the deficient performance of counsel in Division 2 (b) (ii). Since there are no other trial counsel deficiencies to aggregate, cumulative-error analysis is not applicable. See *Holland v. State*, 314 Ga. 181, 193 (4) (875 SE2d 800) (2022) (cumulative-error analysis was not applicable because there was only one instance of presumed deficient performance by defense counsel).

*Judgment affirmed. All the Justices concur.*