S12A1143. WOODS v. THE STATE.
(733 SE2d 730)

HINES, Justice.

John Dennis Woods appeals his convictions for malice murder, aggravated assault, possession of a firearm during the commission of a felony, and concealing the death of another, all in connection with the death of Travis Sauls.[1] For the reasons that follow, we reverse.

Construed to support the verdicts, the evidence showed that Sauls lived in the home of Gross, who is Woods's first cousin; Woods lived in a nearby house. On September 28, 2009, Woods requested that Sauls come to his house to paint a storage container and wash Woods's truck. The next day, Sauls was seen painting at Woods's home. At approximately 11:00 a.m., a neighbor heard three or four gunshots come from the direction of Woods's home, with a pause between the first and second shots. On September 30, 2009, Gross asked Woods if he had seen Sauls, and Woods responded that he had not but that Sauls was not welcome at his home anymore because he had done a poor job of washing his truck.

On October 2, 2009, Woods's brother went hunting on property in Florida belonging to their father, Roy Woods, and discovered suspicious burned items. The brother contacted a friend who was a law enforcement officer in Florida; together, they went to the hunting property and the brother's friend notified local law enforcement

---

[1] The crimes occurred on September 29, 2009. On May 17, 2010, a Berrien County grand jury indicted Woods for malice murder, felony murder while in the commission of aggravated assault, aggravated assault, possession of a firearm during the commission of the felony of aggravated assault, and concealing the death of another. Woods was tried before a jury September 14-16, 2011, and found guilty on all charges. On October 12, 2011, by order nunc pro tunc September 16, 2011, Woods was sentenced to a term of life in prison for malice murder, a concurrent term of 20 years in prison for aggravated assault, and terms of five years in prison for possession of a firearm during the commission of the felony of aggravated assault and concealing the death of another, to be served consecutively with the life term and with each other; the felony murder count was vacated by operation of law. See *Malcolm v. State,* 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Woods filed a notice of appeal on October 13, 2011. His appeal was docketed in this Court for the April 2012 term, and orally argued on June 5, 2012.

personnel. At the property, investigators recovered Saul's body fragments, including his burned torso and portions of his skull.

That same day, Roy Woods met with Woods, who told him that he had killed Sauls in self-defense and taken the body to Florida to dispose of it. At Woods's home, investigators recovered partially burned clothing and a hidden pistol that proved to have fired the bullets that killed Sauls.

1. The evidence authorized the jury to find Woods guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Woods met with investigating law enforcement officers on October 3, 2009, October 5, 2009, and October 7, 2009. At each meeting he was represented by counsel Tomlinson. Before trial, Woods, through new counsel, moved to suppress any evidence gained during those meetings, as well as all products of resulting searches, contending that Tomlinson was ineffective in failing to properly investigate Woods's mental condition and in allowing Woods to make any statements to the investigators. The trial court found no ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). Under that test, in order to prevail on a claim of ineffective assistance of counsel, Woods must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense.[2] *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland*, supra. To meet the first prong of that test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, he must show that there is a reasonable

---

[2] *Strickland* recognized the right to the effective representation of counsel under the Sixth Amendment to the Constitution of the United States. We assume, without deciding, that the trial court was correct in concluding that the right to the effective assistance of counsel under the Sixth Amendment had arisen as to the representation at issue. See *Rackoff v. State*, 281 Ga. 306, 308-309 (1) (637 SE2d 706) (2006); *O'Kelley v. State*, 278 Ga. 564, 565-568 (2) (604 SE2d 509) (2004) (disapproved on other grounds, *Stinski v. State*, 286 Ga. 839, 856 (61), n. 5 (691 SE2d 854) (2010)). We note that it does not appear that the United States Supreme Court has recognized a right to the effective assistance of counsel under the Fifth Amendment to the Constitution of the United States. See *Sweeney v. Carter*, 361 F3d 327, 333 (IV) (7th Cir. 2004). We also assume, without deciding, that it was appropriate for Woods to raise this ineffective assistance claim in a pre-trial motion, before there was an outcome of the trial against which to assess any prejudice. But see *Sosniak v. State*, 287 Ga. 279, 287 (1) (B), n. 3 (695 SE2d 604) (2010).

probability that, absent any unprofessional errors on counsel's part, the result of the proceeding would have been different. Id. at 783. "'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State,* 277 Ga. 75, 76 (586 SE2d 313) (2003).

On October 3, Woods, through Tomlinson, gave a general statement of the facts, including that he shot Sauls because he feared for his life; Woods answered limited questions and postponed any detailed questioning until October 5. On October 5, he told officers that: Sauls was at Woods's home to do some painting and wash and wax Woods's truck; Sauls told Woods that Sauls and Woods's cousin Gross had a disagreement; Sauls was angry at Gross and said he would kill anyone who crossed him; Sauls began circling Woods, moving his hands, and looked "bug eyed"; Woods felt threatened; Woods went inside his home and retrieved a handgun; Woods returned with the pistol hidden in a potato chip bag; Sauls continued to walk around Woods, looking between Woods and the truck; Woods believed Sauls would kill him and take his valuables; Woods shot Sauls in the back; as he did so, Sauls continued to move his hands as if he was attempting to grasp Woods, still with a wild look in his eyes; Woods shot two or three times; Woods never saw a weapon on Sauls's person; Woods covered Sauls's body with a tarp, placed it in a child's plastic pool, and shoveled bloodstained dirt into the pool; Woods placed the pool on a utility trailer, placed four tires over it, covered all of it with another tarp that he secured with bungee cords, and drove his truck and the trailer to his father's hunting property in Florida, arriving about 1:00 p.m.; Woods arranged the pool, body, and tarps, with a tire over them; when it became dark that evening, Woods poured some gasoline on the pile, and lit it; when the tire had burned about halfway, Woods added a second tire, and then a third and fourth as each tire became partly consumed; Woods cleaned up at the cabin on the property, and returned to his residence in Georgia, where he showered and burned his clothes; he cried for "a couple of hours"; Woods returned to the hunting property and placed ashes from the fire in a bucket that he dumped into a ditch; he took a portion of Sauls's torso that had not fully burned, loaded it on a wheeled dolly, took it to another portion of the property, and attempted to cover it with natural debris; Woods took unburned portions of tires and the pool to a nearby trash dump; Woods did not know Sauls to be violent or to own a handgun; and, Woods did not tell anyone about these events until October 2, 2009, when his father confronted him.

At the October 7 meeting, investigators asked for, and received, consent to search Woods's truck, trailer, and residence.

During the hearing on the motion to suppress, Tomlinson testified that: on October 3, 2009, he received a telephone call from Winningham, who was a law enforcement officer as well as a friend of Woods and Woods's father; Winningham told him what had been related to him by Woods and Roy Woods, namely that a body had been found in Florida and Woods had taken the body there; Winningham thought that Woods needed to be taken into custody; Woods intended to turn himself in to law enforcement officers; Tomlinson agreed to meet Woods, Roy Woods, and Winningham at the sheriff's office, to which the three other men had already resolved to go; Tomlinson arrived at the sheriff's office before Woods and the others; it was possible that, before Woods and his companions arrived, Tomlinson could have told a law enforcement investigator what he had learned during the telephone call,[3] although he was certain he relayed the information at sometime during his representation; Woods appeared to be rational, although under some stress; Tomlinson advised Woods that, as he claimed self-defense, cooperation with the law enforcement officers was his best course and he should consent to a search of his home, especially as Tomlinson believed the officers had a basis for a search warrant; Woods was informed of his rights before each statement to the officers, and it was Tomlinson's opinion that his statements were freely and voluntarily given; Tomlinson knew that, based on answers Woods gave to intake officers at the jail, he was not permitted certain items in his cell, but that Woods was not on a "suicide watch"; Tomlinson did not recall "at all" Roy Woods telling him on October 3 that Woods might have a diminished mental capacity, but he did have such a discussion with Roy Woods later; on October 3, Tomlinson knew that Woods was an adult, without a guardian, with a driver's license, lived with his mother, but nonetheless functioned on his own; before any statement to the investigators, he conferred with Woods in a conference room; Woods's decision to turn himself in to law enforcement officers had been made before Tomlinson met with him, apparently in conjunction with Roy Woods[4] and Winningham; Woods claimed he shot Sauls in self-defense; Tomlinson told Woods not to speak to anyone unless Tomlinson was present; Tomlinson had no concerns about the content of the October 3 statement being revealed to the investigators because he understood that all of the information therein was already in the hands of

---

[3] The investigator testified that Tomlinson told him that a crime had been committed, and "something" about what Tomlinson had been told by Roy Woods.

[4] At trial, Roy Woods testified that after Woods told him that he had killed Sauls, Roy Woods said "there's only one thing you can do here, and you've got to tell the truth."

law enforcement personnel, through Winningham's involvement; and, during the October 3 statement, Tomlinson made a general statement to officers, and Woods answered some questions, but Tomlinson arranged for any detailed questioning to be postponed until October 5, to give him an opportunity to investigate the case.

The court found as fact that Woods initiated contact with law enforcement officers, intended to turn himself in prior to contacting Tomlinson, and, through another, instructed Tomlinson to meet him at the office of the sheriff. Woods contends this was not so, citing the testimony of Roy Woods to the effect that, on October 3, 2009, Tomlinson directèd that Woods go to the sheriff's office and meet him there, and that when the men arrived at the sheriff's office, Roy Woods met Tomlinson outside, told him of Woods's medical history and that Woods had a brain abnormality, learning and developmental disabilities, needed medication, and would not be able to "get this." However, this testimony compared with Tomlinson's presented a conflict in the evidence, resolution of which is for the trial court, and the court's findings are supported by evidence and not clearly erroneous. See *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000).

Tomlinson was faced with a client who had decided to turn himself in and had already revealed to a law enforcement officer that he had killed Sauls, claiming self-defense, and that he had attempted to conceal the body. Viewing Tomlinson's conduct in the context of his perspective at the time of the interrogations, we cannot conclude that he rendered ineffective assistance in permitting Woods to cooperate in the interrogations and searches. See *Bowley v. State*, 261 Ga. 278, 281 (4) (404 SE2d 97) (1991). The fact that present counsel might have pursued a different strategic course does not render Tomlinson's strategy unreasonable. *Freeman v. State*, 284 Ga. 830, 835 (4) (672 SE2d 644) (2009).

Nor has ineffective assistance of counsel been shown in counsel's failure to investigate further Woods's mental state before proceeding with the interrogations. Assuming that the facts known to Tomlinson gave a basis for doing so and that his performance was deficient, "it is not enough to show merely that counsel unreasonably failed to inquire into [Woods's] mental state — he must show a (reasonable probability) that such an evaluation would have affected the outcome at trial." *Devega v. State*, 286 Ga. 448, 450 (4) (a) (689 SE2d 293) (2010) (Citations and punctuation omitted.) No evidence was presented that Woods was incapable of freely and voluntarily deciding to cooperate with law enforcement officers and waiving his right to remain silent, and there is no showing that further investigation on Tomlinson's part would have resulted in a different decision as to whether to cooperate with the investigation.

3. Woods presented evidence that he suffered from a mental disease that could have produced a seizure causing a temporary delusion that Sauls posed a threat to Woods's life, even though Sauls may not, in fact, have posed any immediate threat. Woods filed a written request that the jury be instructed on the law regarding a verdict of not guilty by reason of insanity in that he was suffering from a delusional compulsion. See OCGA § 16-3-3.[5] During the charge conference, the trial court agreed to give that instruction, as well as certain other written instructions Woods requested. The next day, immediately before argument, Woods verbally requested that the jury be instructed on the law regarding the defense of justification in defense of self, using pattern charges; Woods had not submitted a written request for such an instruction. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, §§ 3.01.10, 3.10.10 (4th ed. 2007). The State objected that no written request for such an instruction had been submitted, the charge conference had been completed the day before, argument was about to commence, and that inclusion of justification instructions would require a number of other instructions to be added. The trial court stated that the instructions would remain as had been decided during the charge conference. The court did not instruct the jury on any principle of justification in defense of self, Woods objected to the failure to so charge the jury after the court's instructions, see OCGA § 17-8-58,[6] and now enumerates the omission as error.

The State contends that Woods's failure to submit a written request for the instruction precludes him from asserting error on the failure to give the instruction.

[A] criminal defendant is ordinarily required to present written requests for any desired jury instructions. OCGA § 5-5-24

---

[5] OCGA § 16-3-3 reads:
     A person shall not be found guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime.

[6] OCGA § 17-8-58 reads:
     (a) Any party who objects to any portion of the charge to the jury or the failure to charge the jury shall inform the court of the specific objection and the grounds for such objection before the jury retires to deliberate. Such objections shall be done outside of the jury's hearing and presence.
     (b) Failure to object in accordance with subsection (a) of this Code section shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. Such plain error may be considered on appeal even if it was not brought to the court's attention as provided in subsection (a) of this Code section.

(b). He is relieved of this duty only "where the omission is clearly harmful and erroneous as a matter of law in that it fails to provide the jury with the proper guidelines for determining guilt or innocence. [Cit.]" *Camphor v. State*, 272 Ga. 408, 414 (6) (b) (529 SE2d 121) (2000).

*Shepherd v. State*, 280 Ga. 245, 252 (4) (626 SE2d 96) (2006). See also *Hayes v. State*, 279 Ga. 642, 646 (4) (619 SE2d 628) (2005) ("[T]he trial court is not required to charge without written request as to any *collateral matter*. [Cit.]") (Punctuation omitted; emphasis supplied.)
The court instructed the jury:

> In order for a mental delusion or delusional compulsion to constitute a defense, it must appear not only that the accused was actually laboring under a delusion at the time of the commission of the alleged criminal act, but the alleged criminal act itself was connected with the particular delusion under which the accused was then laboring, and that the delusion was as to a fact that if true would have justified the alleged act by the accused. This is a question of fact to be determined by you.

This instruction, as far as it goes, is correct. But the legal concept of justification is a necessary component of the delusional compulsion defense.

> In Georgia, a person is not legally insane simply because [he] suffers from schizophrenia or a psychosis. [Cit.] Rather, a defendant is not guilty by reason of insanity if, at the time of the criminal act, the defendant did not "have the mental capacity to distinguish between right and wrong in relation to such act" or a mental disease caused "a delusional compulsion that overmastered his will to resist committing the crime." OCGA §§ 16-3-2, 16-3-3. . . . *When a delusional compulsion is the basis of an insanity defense, the delusion must be one that, if it had been true, would have justified the defendant's actions*. [Cit.]

*Alvelo v. State*, 290 Ga. 609, 612 (3) (724 SE2d 377) (2012) (Emphasis supplied.)

> It is only in those instances where an individual, who is able to distinguish right from wrong, commits a criminal act while suffering under a delusional compulsion which leads

him to believe his action is *right*, i.e., "justified," that Georgia law accepts insanity as a defense. Hence, "if the delusion is as to a fact which would not excuse the act with which the prisoner is charged, the delusion does not authorize an acquittal of the defendant." [Cit.]

*Lawrence v. State*, 265 Ga. 310, 313 (2) (454 SE2d 446) (1995) (Emphasis in original). The delusional compulsion defense is available only when the defendant is "suffering under delusions of an absurd and unfounded nature [and] was compelled by that delusion to act in a manner that would have been *lawful and right* if the facts had been as the defendant imagined them to be." Id. (Emphasis supplied; footnote omitted.)

Accordingly, the jury could not determine whether Woods was suffering from a delusion that satisfied the legal definition without an understanding of what constituted an act that would have been justified, if the circumstances were as Woods contended he believed them to be, without being instructed as to what conduct would constitute justification. Absent such an instruction, the jury was not provided "with the proper guidelines for determining guilt or innocence." *Shepherd*, supra. (Citation and punctuation omitted.) Accordingly, Woods must be afforded a new trial.[7]

*Judgments reversed. All the Justices concur.*

DECIDED OCTOBER 29, 2012.

*J. Converse Bright*, for appellant.

*Catherine H. Helms, District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Benjamin H. Pierman, Assistant Attorney General*, for appellee.

---

[7] This disposition makes it unnecessary to treat Woods's remaining enumeration of error as it addresses a situation unlikely to recur on retrial.