295 Ga. 568
FINAL COPY

S14A0578.  CHOISNET v. THE STATE.

HUNSTEIN, Justice.

Appellant Fredrick Choisnet, Jr., was indicted and tried for murder and related charges in connection with the stabbing death of his elderly father. Choisnet pled not guilty by reason of insanity, claiming he suffered from mental illness that had rendered him incapable of distinguishing right from wrong in relation to his crimes and caused him to suffer under the delusion that his father was planning to kill him and his mother.  The jury found Choisnet guilty but mentally ill, and Choisnet now appeals, contending that the trial court's instructions to the jury were erroneous in several ways.  Finding no error, we affirm.[1]

---

[1]The crimes were committed on March 5, 2007.  In May 2007, Choisnet was indicted by a Chatham County grand jury for malice murder, felony murder, aggravated assault, elder abuse, and possession of a knife during the commission of a felony.  In March 2009, Choisnet filed his insanity plea.  At the conclusion of a jury trial held August 30-September 2, 2010, the jury found Choisnet guilty but mentally ill on all counts.  The trial court thereafter sentenced Choisnet to life imprisonment for malice murder, plus a five-year consecutive probated sentence for the weapon possession offense; the remaining counts merged into the malice murder count. Choisnet filed a timely motion for new trial on September 13, 2010, which he

Viewed in the light most favorable to the jury's verdicts, the evidence adduced at trial established as follows. On March 5, 2007, Choisnet stabbed his elderly father with multiple implements, including knives and carving forks, at the family's home. Choisnet's father died as the result of more than 200 sharp and blunt force injuries, which caused him to bleed to death; he had also sustained injuries consistent with manual strangulation. Choisnet admits to having committed the attack.

Choisnet has a long history of mental health problems. In 1973, at age 20, he was hospitalized at a psychiatric institution in Long Island, New York, and in the years since then, he has been treated for mental health problems on numerous occasions, including hospitalizations in 1993, 2000, 2004, and 2007. His diagnoses included bipolar disorder with psychotic features, major

---

amended on August 1, 2011. Following a hearing on August 8, 2011, the new trial motion was denied on November 27, 2012, and Choisnet filed a notice of appeal on December 21, 2012. The appeal was thereafter docketed in this Court, which, upon consideration, remanded the case to the trial court with direction to review the new trial motion under the "thirteenth juror" standard pursuant to OCGA §§ 5-5-20 and 5-5-21. See Choisnet v. State, 292 Ga. 860 (742 SE2d 476) (2013). On remand, the trial court again denied the new trial motion in an order entered October 2, 2013. On October 29, 2013, Choisnet filed a notice of appeal. This second appeal was docketed to the January 2014 term of this Court and was thereafter submitted for decision on the briefs.

depression, schizophrenia, and alcohol dependency.  The last of his hospitalizations occurred just six weeks before the murder, when Choisnet was involuntarily committed after expressing thoughts about killing his father and reporting feelings of paranoia and auditory hallucinations.

Choisnet's sister, Jheri Galbraith, spent time with Choisnet during the week prior to the murder and testified that she suspected he had stopped taking his medications based on his antisocial and inappropriate behavior.  Evidence uncovered after the murder indicated that Choisnet had been secreting his medications in his bed linens rather than taking them as prescribed.  Galbraith testified that, on the day before the murder, Choisnet was dressed oddly, his shirt on  inside out with a belt cinched over it and his underwear on over his pants, and was acting strangely, dragging his dog around the house with a rope around its neck.  After unsuccessfully trying to convince her brother to go to the hospital, Galbraith called 911, but the responding officers did not deem Choisnet a sufficient threat to justify taking him into custody.

In the aftermath of the attack, Choisnet called 911 and told the operator his father had attacked him with a knife.  When police arrived at the home, Choisnet was "extremely erratic," told one of the officers that his father had

tried to stab him, and also stated, "I think he may have killed my real father." When interviewed by police later that day at the hospital, Choisnet said that his father had attacked him with the phone; in this interview, Choisnet appeared lucid and gave no indication of delusional thinking. In another interview at the county jail, Choisnet stated that he thought his actions may have resulted from too high a dose of his medication. He also told the detective that he and his father had been in an argument and that his father had tried to attack him with a knife.

While in jail awaiting trial, Choisnet wrote several letters to Galbraith in which he spoke about pleading insanity, predicting he would have to serve three to five years on such a plea; made odd remarks about not having to worry about Father's Day and whether their mother was stabbing anyone; and maintained that their father intended to kill him and their mother. Choisnet also spoke at length about the idea of an insanity plea with a fellow inmate, who testified that Choisnet appeared to understand that what he had done was wrong but did not want to be held accountable for his actions.

At trial, Choisnet presented expert testimony from a clinical psychologist, Dr. Jane Weilenman, who had met with Choisnet pre-trial, interviewed his

4

family, and reviewed his case history. Based on these sources, Dr. Weilenman opined that, at the time of the crimes, Choisnet "had poor insight and his judgment was limited," "may have experienced a psychotic break," and could have been hallucinating and delusional. In rebuttal, the State presented the expert testimony of Dr. Nic Alessandro, a forensic psychologist whom the trial court had appointed to assess Choisnet's competency and legal culpability. Based on his evaluation, Dr. Alessandro opined that, at the time of the crimes, Choisnet was aware of his actions, was not delusional, and did recognize the difference between right and wrong. Dr. Alessandro further opined that Choisnet did not meet the criteria for an adjudication of not guilty by reason of insanity but did meet the criteria for guilty but mentally ill.[2]

1. Though Choisnet has not enumerated the general grounds, we find that the evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Choisnet was guilty of the crimes of which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). The jury was likewise authorized to reject Choisnet's

---

[2]See OCGA § 17-7-131 (c) (distinguishing between verdict of "not guilty by reason of insanity" and verdict of "guilty but mentally ill").

5

insanity defense. See <u>Durrence v. State</u>, 287 Ga. 213 (1) (b) (695 SE2d 227) (2010).

2. Choisnet contends that the trial court erred in its instructions to the jury on the insanity defense. Under Georgia law, the affirmative defense of insanity may be established by showing that, at the time of the act constituting the crime, the defendant either (1) "did not have mental capacity to distinguish between right and wrong in relation to such act" or (2) had a mental disease causing "a delusional compulsion as to such act which overmastered his will to resist committing the crime." OCGA §§ 16-3-2, 16-3-3. In regard to the latter, we have previously held that this "delusional compulsion" insanity defense requires that the delusion alleged "be one that, if it had been true, would have justified the defendant's actions." (Citation and punctuation omitted.) <u>Alvelo v. State</u>, 290 Ga. 609 (3) (724 SE2d 377) (2012). In other words,

> [t]he delusional compulsion defense is available only when the defendant is "suffering under delusions of an absurd and unfounded nature [and] was compelled by that delusion to act in a manner that would have been *lawful and right* if the facts had been as the defendant imagined them to be."

(Citation omitted.) <u>Woods v. State</u>, 291 Ga. 804, 811 (3) (733 SE2d 730) (2012). We have further held that juries must be instructed regarding the legal

6

concept of justification in order to be equipped to make the determination of whether the defendant's conduct would have been a "lawful and right" response had the alleged delusion represented reality. Id. (reversing conviction where trial court had denied defendant's request to instruct jury on meaning of justification in this context).

Here, the trial court's instructions on delusional compulsion insanity did not include any explanation as to what would constitute a legal justification for a criminal act. However, Choisnet's counsel neither made a request in this regard nor objected to the trial court's failure to incorporate this concept into the jury charge.[3] Therefore, we may review this particular enumeration only for "plain error." See Alvelo, 290 Ga. at 614-615.

> "Plain error" requires a clear or obvious legal error or defect not affirmatively waived by the appellant that must have affected the appellant's substantial rights, i.e., it affected the outcome of the trial-court proceedings. Stated more succinctly, "the proper inquiry is whether the instruction was erroneous, whether it was obviously so, and whether it likely affected the outcome of the proceedings."

---

[3]We surmise that trial counsel's failure to raise this issue was due at least in part to the fact that the Woods case, in which we announced the rule requiring explanation of the legal concept of justification, had not been decided as of the time of trial. The instruction that was given largely tracked the pattern charge that was in effect at the time. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.80.30 (4th ed. 2009).

If the failure to give an instruction is shown to constitute such an error, the appellate court may remedy the error by exercising its discretion if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citations and punctuation omitted.) Id.

Assessed against this onerous standard, Choisnet's claim cannot prevail. Even granting that the failure to elaborate on the concept of justification would now constitute error under Woods, and even assuming arguendo we were to find such error "plain" despite the fact that the issue was unsettled at the time of trial, see Henderson v. United States, __ U. S. __ (133 SCt 1121, 185 LE2d 85) (2013), we do not find that the error likely affected the outcome of the trial or seriously affected its fairness or integrity. In short, the evidence is far from clear as to whether Choisnet acted as the result of any delusional compulsion. Though there is no dispute that Choisnet suffers from serious mental illness and there was some evidence indicating that Choisnet feared his father would kill him and his mother, not even Choisnet's own expert was willing to testify to a reasonable degree of medical certainty that he was actually delusional at the time he stabbed, beat, and strangled his father. Rather, Dr. Weilenman opined only that Choisnet "may have" been experiencing a psychotic break and it was

"possible" that he was hallucinating at the time. Dr. Alessandro, by contrast, opined flatly that he did not believe Choisnet's conduct was involuntary or compelled. Thus, even with proper instruction as to what type of delusional belief would constitute sufficient legal justification to commit murder, it is unlikely the jury would have reached a different verdict. We therefore find no plain error in the trial court's failure to charge the jury on the legal concept of justification.

3. Choisnet also faults the trial court for refusing his request to remove from the jury's consideration the option of finding Choisnet guilty but mentally ill and, specifically, for including this option in its charge to the jury. Apparently for strategic reasons, Choisnet's counsel sought to offer the jury the choice only between a verdict of "guilty" and one of "not guilty by reason of insanity." The trial court properly declined this request, given the statutory mandate that, for all felony cases in which the insanity defense is interposed, "the jury . . . *shall* find whether the defendant is: (A) Guilty; (B) Not guilty; (C) Not guilty by reason of insanity at the time of the crime; [or] (D) Guilty but mentally ill at the time of the crime. . . ." (Emphasis supplied.) OCGA § 17-7-131 (b) (1). Consistent with the requirement that the jury be offered these

9

options, the jury must also be properly instructed in this regard.  Id. at (b) (3), (c).  This enumeration is, thus, without merit.

4.  Choisnet's final enumeration assails the trial court's inclusion of the pattern charge on "Insanity; Consider Evidence as a Whole," which instructs, in part, that "[i]f the evidence as a whole raises a reasonable doubt as to the defendant's guilt, the doubt must be resolved in favor of the accused." Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.80.60 (4th ed. 2009).   Though Choisnet contends this charge was inapposite given his admission that he committed the crimes, we find neither error nor any harm in including this pattern charge, which is generally favorable to the accused.

Judgment affirmed.  All the Justices concur.


Decided July 11, 2104.

Murder. Chatham Superior Court. Before Judge Freesemann.

Steven L. Sparger, for appellant.
Meg E. Heap, District Attorney, Shalena C. Jones, Isabel M. Pauley, Assistant District Attorneys, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Andrew G. Sims, Assistant Attorney General, for appellee.