316 Ga. 611
FINAL COPY

S23A0214.  KING v. THE STATE.

WARREN, Justice.

After a jury trial in January 2020, Rico Jabar King was

convicted of the malice murder of Michael Brooks and possession of

a firearm during the commission of a felony based on shooting

Brooks.[1]  King raises four claims of error on appeal: (1) that the trial

court erroneously denied King's motion for a new trial on the

"general grounds"; (2) that the trial court should not have allowed

witness testimony and closing arguments about voluntary

---

[1] The crimes occurred on March 28, 2018.  On May 24, 2018, a DeKalb
County grand jury indicted King on four counts: malice murder, felony murder,
aggravated assault, and possession of a firearm during commission of a felony.
After a jury trial from January 14 to 23, 2020, King was found guilty on all
counts.  On January 23, 2020, King was sentenced to life in prison without the
possibility of parole for malice murder and five years to be served consecutively
for possession of a firearm during the commission of a felony.  The remaining
counts either were vacated by operation of law or merged with other counts.
King filed a timely motion for new trial on February 18, 2020, which he
amended on April 13, 2022.  On June 22, 2022, the trial court denied King's
amended motion for new trial.  King timely filed a notice of appeal on July 19,
2022, directed to the Court of Appeals, which was transferred to this Court on
October 5, 2022.  The case was docketed in this Court to the term beginning in
December 2022 and submitted for a decision on the briefs.

intoxication; (3) that the trial court plainly erred by admitting character evidence about King's alleged past alcohol and illegal drug use; and (4) that King received constitutionally ineffective assistance of counsel.

As explained more below, we conclude that King's general grounds claim fails. The trial court did not plainly err by allowing witness testimony about voluntary intoxication, and King waived his claim that the trial court should not have allowed closing arguments about voluntary intoxication. King also affirmatively waived his claim that the trial court erred by admitting purported character evidence about King's past alcohol and illegal drug use. And King has failed to show that he received constitutionally ineffective assistance of counsel. We therefore affirm King's convictions.

1. (a) The evidence presented at trial showed the following. On March 28, 2018, just before noon, Brooks was walking down the sidewalk on Glenwood Road in DeKalb County. King was in his black pickup truck driving down Glenwood Road in the same

direction. Shortly after passing Brooks, King pulled into the parking lot of a restaurant and parked his truck parallel to the road. Once Brooks walked past King's passenger-side window, King fired a shot at Brooks with a .40-caliber pistol.

A witness who worked at a shopping center on the corner of Glenwood Road heard the gunshot. He looked out the window and "saw a guy fall down right beside the pickup truck that was over at" a restaurant. He then saw Brooks[2] "pushing himself down the sidewalk" before King stepped out of the pickup truck with a gun. Brooks stood up.

That witness and three other witnesses saw Brooks try to make his way across Glenwood Road before he was shot again, causing him to fall down in the street. One of the witnesses testified that the shooter, whom she identified at trial as King, then "stood over [Brooks], and emptied his whole clip." Two of the witnesses watched the shooting from inside a shop on Glenwood Road and testified that

[2] None of the eyewitnesses knew Brooks or King, and only one identified King at trial.

3

they were beating on a window as they watched; once King was done shooting, he looked at them, nodded his head, and walked away.

After the shooting, King walked back to his pickup truck without a sense of urgency and drove off. None of the witnesses had heard or seen any other interaction between King and Brooks before the shooting.

Multiple people called 911 to report the shooting and police quickly responded. Shortly thereafter, three police officers spotted King's pickup truck driving down the road. The officers attempted to stop the pickup truck, but King continued to drive at around 30 to 40 miles per hour, without obeying traffic lights or stop signs, for a few miles before pulling into a gated apartment complex. King attempted to enter the gate code. Although King at first did not respond to police commands to exit the truck, the officers eventually were able to remove him from the truck and take him into custody.

Back at the crime scene, Brooks's body was found in the middle of the road. He had been shot 13 times and died as the result of the gunshot wounds. The medical examiner later determined that the

4

manner of death was homicide, and the parties later stipulated that the gun used to shoot Brooks was a .40-caliber handgun recovered from King's pickup truck.

(b) Later on the day of the crimes, Detective Keith McQuilkin interviewed King at DeKalb County police headquarters. Detective McQuilkin read King his rights under *Miranda*,[3] which King waived. A recording of this interview was played for the jury. In the interview, King stated that the police stopped him because he "shot someone." King said that he shot Brooks with his .40-caliber Smith & Wesson handgun, which he left in his pickup truck. When Detective McQuilkin asked what happened, King said he "really just shot him" and that he "murdered him." Among other things, King, in explaining why he shot Brooks, said, "I guess I had to kill the baby";[4] that he thought Brooks was the devil; and that he thought Brooks was going to kill him, but Brooks did not say anything to

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[4] As explained in Division 1 (c), a psychiatrist testified at trial that, in his opinion, King thought that Brooks was a "baby" version of King. King was 42 years old and Brooks was 29 when the crimes occurred.

make King think that.  King also went back and forth between saying that he did and did not know Brooks.[5]

King was charged with malice murder, felony murder, aggravated assault, and possession of a firearm during commission of a felony in connection with Brooks's killing.

(c) King asserted insanity as a defense at trial, arguing that he lacked the ability to distinguish between right and wrong during the commission of the crimes.  King called multiple witnesses at trial to support that defense.

Three of those witnesses provided expert testimony.  The first was Dr. Matthew Norman, a licensed psychiatrist, whom the trial court qualified as an expert in psychiatry, forensic psychiatry, and psychiatric pharmacology.  He testified that there was "clear evidence that [King] was psychotic" on the day of the crimes, and that someone experiencing King's symptoms would have had

---

[5] Detective McQuilkin ultimately determined that King and Brooks did not know each other.

6

"difficulty" distinguishing between right and wrong on the day of the shooting.

In Dr. Norman's opinion, King's "thinking at the time of the incident" was that King "essentially heard a voice that [Brooks] was [King's] baby form" and that King was "command[ed]" to "kill his baby self" in order to save King. Dr. Norman thought that King's psychosis was caused by a weight-loss pill that King had been taking called phentermine. Dr. Norman noted that King had been prescribed 30 phentermine pills in March 2017, a year before the crimes, and then again in March 2018, the same month of the crimes. He recounted evidence that King was taking the pills daily, but noted that this information was based only on King's self-reports.

Dr. Norman agreed that there is "not a lot" of research into the relationship between phentermine and psychosis. He testified that there had been "a total of nine . . . documented individual cases" of "phentermine-related psychosis" since the drug hit the market in 1959, making it a "known side effect, but not a common" one. But of

7

the nine people whose phentermine-related psychosis was reflected in published reports, five of them were "taking more than the prescribed dosage," two had "a history of psychiatric illness or they had a family history of psychiatric illness," another was taking the prescribed dose of phentermine but "he bought it off the street . . . so there is no guarantee" that it was actually phentermine and he was also taking methadone at the same time, and another "had a past history of depression, and she was taking it with marijuana." Dr. Norman later testified that psychosis was listed as a side effect of phentermine on the package insert—a published informational document reflecting a "combination of what the FDA and the manufacturer have agreed" needs to be listed—and that the placement of the psychosis side effect's listing on the package insert reflected that it was the least common side effect listed.

King also called Dr. Margaret Flanagan, a licensed psychologist with the Georgia Department of Behavioral Health and Developmental Disabilities, and the trial court qualified her as an expert in psychology and forensic psychology. Among other things,

Dr. Flanagan concluded that someone experiencing "[t]he symptoms that [King] reported that he experienced" at the time of the crimes would not know the difference between right and wrong. Although Dr. Flanagan would not "speak directly" to the cause of King's mental state because that is a "medical issue" and Dr. Flanagan is "not a medical doctor," she thought that phentermine was the "likely" cause of King's mental state.

Dr. Amy Gambow, a licensed clinical psychologist working at Georgia Regional Hospital, was qualified as an expert in psychology and forensic psychology. King's counsel asked Dr. Gambow whether someone "showing the symptoms and the mental processes" that King displayed would be able to "distinguish between right and wrong," to which she responded, "[i]t does not seem so." Dr. Gambow "determined that the cause of the psychosis was from phentermine."

King also introduced testimony from two lay witnesses: his wife, Angela, and his girlfriend, Holly Hill.[6] Angela and King had

---

[6] Evidence was presented that King was having an extramarital affair with Hill.

been married for about 18 years before the crimes. She testified that aside from the few weeks leading up to the shooting, King had never shown "symptoms of mental illness or bizarre behavior" and had not to her knowledge "ever [been] diagnosed with any major mental illness." The night before the crimes, however, King was acting "strange." Angela also testified that King had been taking phentermine, and that when she gave King's pill bottle to his prior lawyer, "[t]here might have been like six" pills left in the bottle.[7]

Hill, who worked with King, had known him for a little over a year before the crimes; they had been in a relationship for "[m]aybe like six months" before the crimes. She testified that King had not shown any "symptoms of mental illness or any strange behavior" around her until "maybe like the two weeks before" the crimes.

King did not testify in his own defense.

(d) In rebuttal, the State offered the expert testimony of Dr. Randall Tackett, a professor at the University of Georgia College of

---

[7] According to the State's expert who testified later at trial, Dr. Randall Tackett, King should have had 14 phentermine pills in the bottle if he were taking one a day as prescribed.

Pharmacy who had worked in the fields of pharmacology and toxicology for "a little over 40 years." The trial court qualified Dr. Tackett as an expert "in the field of pharmacology, toxicology, and regulatory affairs." He explained that pharmacology "looks at how drugs produce their effects" and that toxicology "focuses more on the side effects or the adverse effects not only of drugs but also of chemicals and different substances."

Dr. Tackett testified that King was prescribed 30 phentermine pills and that had he been taking one a day as prescribed, there would have been 14 left on the day of the crimes. He also testified that taking "more than the prescribed dosage . . . would greatly increase the potential" for phentermine to cause psychosis. Dr. Tackett testified that if King "was taking the drug as prescribed[,] that it would not have caused psychosis." But "[i]f he was taking more of the drug than was prescribed, then that is a potential for causing the psychosis." Even so, Dr. Tackett still "would not expect the psychosis to be prolonged to the extent that" King's psychosis reportedly was. Dr. Tackett clarified that he did not evaluate

11

"whether [King] was psychotic," but examined whether King's "reported psychosis" was caused by phentermine.

The jury convicted King on all counts. He was sentenced to life without the possibility of parole for malice murder and five years to be served consecutively for possession of a firearm during the commission of a felony.

2. King contends that the trial court committed reversible error when it failed to grant his motion for new trial. Specifically, he argues that the trial court should have exercised its discretion as the thirteenth juror and granted King's motion for new trial "in the interest of justice." That argument implicates the "general grounds" for obtaining a new trial under OCGA §§ 5-5-20 and 5-5-21.

"When these so-called 'general grounds' are properly raised in a timely motion for new trial, the trial judge must exercise a broad discretion to sit as a 'thirteenth juror.'" *Ridley v. State*, 315 Ga. 452, 456 (883 SE2d 357) (2023) (citation and punctuation omitted). Sitting as the thirteenth juror "requires the judge to consider matters typically reserved to the jury, including conflicts in the

evidence, witness credibility, and the weight of the evidence."  Id.

But, contrary to King's argument, "the merits of the trial court's

decision on the general grounds are not subject to our review," id.,

and the decision to grant a new trial on the general grounds "is

vested solely in the trial court."  *Ward v. State*, 316 Ga. 295, 299 (\_\_\_

SE2d \_\_\_) (2023) (citation and punctuation omitted).

To the extent King argues the trial court failed to exercise its

discretion as the thirteenth juror, we disagree.  In its order denying

King's motion for new trial, the court expressly rejected King's

general grounds claim because it found that "the weight of the

evidence does not preponderate heavily against the verdict and the

verdict was not contrary to the evidence or the principles of justice

and equity."  King's general grounds claim therefore fails.[8]  See

---

[8] King does not separately enumerate as alleged error that the evidence was insufficient under *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).  However, in the past, in evaluating a trial court's denial of a motion for new trial on the general grounds, see OCGA §§ 5-5-20 and 5-5-21, we have performed or referenced a constitutional due process sufficiency-of-the-evidence review under *Jackson*.  See, e.g., *Montgomery v. State*, 315 Ga. 467, 474 (883 SE2d 351) (2023); *Bundel v. State*, 308 Ga. 317, 318-319 (840 SE2d 349) (2020); *Lewis v. State*, 296 Ga. 259, 261 (765 SE2d 911) (2014).  But see *Caviston v. State*, 315 Ga. 279, 282-284 (882 SE2d 221) (2022) (limiting the

*Strother v. State*, 305 Ga. 838, 843 (828 SE2d 327) (2019) (trial court properly exercised its discretion as the thirteenth juror when "[i]n its order denying the motion, the trial court referred to the numbered paragraphs in which Appellant asserted the general grounds in his motion and then said, 'the State presented ample evidence to support the jury verdict and . . . the evidence was not sufficiently close nor represents a failure of justice in general'") (omission in original). See also *Ward*, 316 Ga. at 299 ("We presume, in the absence of affirmative evidence to the contrary, that the trial court did properly exercise such discretion.") (citation and punctuation omitted).

---

general-grounds analysis to evaluating whether the trial court exercised its discretion when the defendant did not make a *Jackson* sufficiency argument as part of his general-grounds enumeration or separately). We have done so despite our recognition that the general grounds and a constitutional sufficiency-of-the-evidence claim under *Jackson* are "two distinct legal arguments" and "require the trial court to apply distinct legal standards." See *Casey v. State*, 310 Ga. 421, 425 (851 SE2d 550) (2020). We have also done so notwithstanding our statements that "the merits of the trial court's decision on the general grounds are not subject to our review." *Ridley*, 315 Ga. at 456.

Although many of us question whether it is proper for this Court to import *Jackson* into an appellate review of the general grounds (or to otherwise rely on *Jackson* as part of that analysis), we need not determine the propriety of that practice today. King's general grounds claim fails in all events because the trial court exercised its discretion as the thirteenth juror, and because the evidence against King was constitutionally sufficient to affirm his convictions.

14

3. King contends that the trial court erred by admitting testimony and allowing argument about voluntary intoxication.[9] First, he argues it was improper for the State to question witnesses and make closing arguments about voluntary intoxication.

Second, King argues that, even if voluntary intoxication generally was a permissible subject, certain testimony and arguments were improper because the State misstated the law of voluntary intoxication and the trial court should have issued an instruction clarifying the relationship between voluntary intoxication and an insanity defense. For the reasons below, King's arguments fail.

(a) Some additional background is necessary before addressing King's arguments. At trial, both the State and King asked multiple witnesses about voluntary intoxication, with respect to both illegal and prescription drugs. King's counsel first asked Dr.

---

[9] In King's brief, this enumeration's heading complains about the trial court's charge on *involuntary* intoxication, but the entirety of the substantive argument following the heading pertains to voluntary intoxication. We therefore construe King's contention as pertaining to voluntary intoxication.

15

Norman why he evaluated "illegal drug use" when he interviewed King. Dr. Norman responded that "voluntary intoxication, taking an illegal substance and getting intoxicated on that and that making our thinking go awry, is not an excuse." King followed up by asking "hypothetically if someone just gets high on cocaine or high on crack[,] becomes psychotic and kills someone, is that voluntary intoxication?" Dr. Norman said that is "up to the law. But in my opinion as an examiner, that is voluntary intoxication." On cross-examination, Dr. Norman agreed that "[i]f someone misuses, abuses, overuses phentermine and became psychotic and killed someone, that would be voluntary intoxication[,]" "[w]hich is not a defense."

Then, in questioning Dr. Flanagan, King asked whether "voluntary intoxication [is] a legitimate cause for being found [not guilty by reason of insanity.]" Dr. Flanagan said, "No." On cross-examination, the State asked whether insanity caused by "misusing" or "abusing" a prescription drug is "voluntary intoxication," which is "not a defense." Dr. Flanagan said, "That's correct."

16

Last, in questioning Dr. Gambow, King asked whether "voluntary intoxication [is] grounds for not guilty by reason of insanity." Dr. Gambow said it "is not." On cross-examination, the State asked whether voluntary intoxication caused by illegal drugs or abusing a prescription is a defense, and Dr. Gambow agreed that it is not.

King argued in closing that there was no evidence of voluntary intoxication. The State, by contrast, argued in closing that if the jury found that King "was lacking in mental capacity due to voluntary intoxication," such a finding would not support a defense for King. In doing so, it emphasized the evidence suggesting that King was taking more phentermine than prescribed. King did not object to any of the above statements at trial.

(b) King contends that the trial court erred by allowing the State's closing arguments about voluntary intoxication because those arguments were unsupported by the evidence and contained misstatements of the law. But King did not object at the time, so these claims are waived. See *Walker v. State*, 312 Ga. 232, 236-237

17

(862 SE2d 285) (2021) (failure to object to closing arguments amounts to waiver); *Gates v. State*, 298 Ga. 324, 328-329 (781 SE2d 772) (2016) (holding that the defendant "waived review of his arguments relating to the allegedly improper closing argument here due to his failure to object below" because plain-error review does not apply to closing arguments).

(c) King's claims that the trial court erred by allowing witness testimony about voluntary intoxication and not issuing a clarifying instruction about the relationship between voluntary intoxication and King's insanity defense are not preserved for ordinary appellate review because King did not object at trial to the relevant testimony or request a clarifying instruction. We nonetheless review these claimed evidentiary and instructional errors for plain error. See *Griffin v. State*, 309 Ga. 860, 863-864 (849 SE2d 191) (2020) (evidentiary errors); *Choisnet v. State*, 295 Ga. 568, 571-572 (761 SE2d 322) (2014) (instructional errors).

The plain-error standard has four prongs.

First, there must be an error or defect—some sort of "[d]eviation from a legal rule"—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the trial court proceedings." Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error— discretion which ought to be exercised only if the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"

*Taylor v. State*, 315 Ga. 630, 637 (884 SE2d 346) (2023) (quoting *Gates*, 298 Ga. at 327).

(i) We first address King's claim that it was improper for the trial court to admit the State's evidence about voluntary intoxication. At trial, King asked all three experts he called about voluntary intoxication and incorporated arguments about the lack of voluntary intoxication into his closing. Therefore, King has affirmatively waived this claim and as a result has failed to show that the trial court plainly erred. See *Griffin*, 309 Ga. at 863-866 (defense affirmatively waived objection to prosecution eliciting

19

testimony about defendant's racism because the defense made a strategic decision not to object to this evidence, and instead attempted to use it "to bolster his claim of self-defense and to undermine the State's case"); *Taylor v. State*, 302 Ga. 176, 180-181 (805 SE2d 851) (2017) (defense affirmatively waived objection to the State's witness testifying about "his opinion on the issue of self-defense" because the defense deliberately introduced the topic of self-defense by asking the witness "several questions about his opinion about the viability of a self-defense claim").

(ii) We next address King's arguments that testimony about voluntary intoxication contained incorrect statements of law and that the trial court should have issued an instruction clarifying the relationship between voluntary intoxication and an insanity defense. This claim fails because King cannot satisfy the plain-error test's third prong: that the alleged error "likely affected the outcome of the trial." *Choisnet*, 295 Ga. at 572.

King complains that expert witnesses testified that voluntary intoxication is not a defense without noting the exception that

voluntary intoxication can be a defense when the intoxication results in a "permanently altered" "brain function so as to negate intent." *Perez v. State*, 309 Ga. 687, 690 n.2 (848 SE2d 395) (2020) (quoting *Horton v. State*, 258 Ga. 489, 491 (371 SE2d 384) (1988) and *Guyse v. State*, 286 Ga. 574, 578 (690 SE2d 406) (2010)) (punctuation omitted). But King did not argue at trial, nor does he argue on appeal, that the jury was likely to have found that he met the requirements of that narrow exception. In fact, he argued at trial that he was *not* voluntarily intoxicated. And now on appeal, he reiterates that his "sole defense" at trial was "temporary insanity"— a claim that is hard to square with his new contention about an exception to voluntary intoxication that would require his brain function to be permanently altered for the exception to apply. See *Perez*, 309 Ga. at 690 n.2. Moreover, King also has not pointed to any evidence suggesting he has such permanent brain alteration. Under these circumstances, King has not carried his burden under the plain-error test's third prong to show that the jury hearing that voluntary intoxication is not a defense, without the trial court giving

21

a clarifying instruction about the exception to that general rule, "likely affected the outcome of the trial." See *Choisnet*, 295 Ga. at 572-573 (holding that the trial court's instruction on a delusional compulsion, "[e]ven granting" that it was incomplete, was "unlikely" to have affected the trial's result because the defendant's expert testified that the defendant "may have been" psychotic during the crimes and the State's expert testified that he "did not believe" the defendant was acting under a delusional compulsion).

4. King contends that the trial court also erred by allowing testimony about King consuming illegal drugs and alcohol—testimony he labels as improper character evidence barred by OCGA § 24-4-404. This claim fails under plain-error review because King affirmatively waived it.

(a) At King's trial, multiple witnesses testified about whether King was known to consume drugs and alcohol. For example, King asked Dr. Norman whether he "address[ed] illegal drug use" when he interviewed King; Dr. Norman said that he did. King's counsel then asked whether there was "a note anywhere in the medical

22

records that suggested [that King] might have used cocaine." Dr. Norman said yes, explaining that a medical record from while King was in jail reflected that, while meeting with a physician, "King admitted to using crack cocaine, smoking marijuana, and drinking alcohol," and another medical record reflected that King later met with the same physician again and retracted that admission.

Dr. Norman testified that certain other medical records also showed that King denied using cocaine. Dr. Norman went on to say that King "certainly tried" to convince Dr. Norman that it was "completely impossible" for him to use drugs because King got his commercial driver's license in 1996 and that King had been subject to random drug tests because of his job as a truck driver but he had "never had any issues," which King "used . . . as evidence that he did not use cocaine." The State asked Dr. Norman about those same medical records reflecting King's admission to consuming cocaine, marijuana, and alcohol. The State asked the same of Doctors Flanagan and Gambow on cross-examination and asked similar

questions while examining the doctor to whom King made that admission.

King also asked Hill, among other things, whether she knew "King to use any illegal substance" and whether he was "subject to random drug screens" at work. Hill answered no to the first and yes to the second question. King also asked whether she knew him to drink alcohol and get intoxicated, and Hill responded that King drank "socially" and did not get intoxicated. And in response to a question from the State on cross-examination, Hill testified that King ordered at least one margarita at lunch the day before the murder. King's trial counsel did not object to any of the above statements and argued in closing that there was a lack of evidence of King's voluntary intoxication.

(b) This enumeration is not preserved for ordinary appellate review: because King did not object to the relevant testimony at trial, we review it only for plain error. See *Griffin*, 309 Ga. at 863-864. And King's argument fails under that review because, having introduced the issue of his alcohol and illegal drug use and argued

24

as part of his defense that there was a lack of evidence of voluntary intoxication, King affirmatively waived this claim—thus failing the first prong of the plain-error test. See id.; *Taylor*, 302 Ga. at 180-181.

5. King contends that his trial counsel provided ineffective assistance under the Sixth Amendment to the United States Constitution in four respects: for failing to (1) properly obtain certification of medical records from while King was incarcerated for the crimes; (2) object to character evidence about King's alcohol and drug consumption; (3) object to an alleged "golden rule" violation; and (4) object to misstatements about the definition of voluntary intoxication and failing to request a clarifying instruction.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant

must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013). See also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See id. at 693-694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

Claims of ineffective assistance of counsel involve mixed questions of law and fact, and "a trial court's factual findings made in the course of deciding an ineffective assistance of counsel claim will be affirmed by the reviewing court unless clearly erroneous." *Green v. State*, 302 Ga. 816, 818 (809 SE2d 738) (2018) (citation and punctuation omitted). Conclusions of law based on those facts are

reviewed de novo.  See *Bright v. State*, 292 Ga. 273, 274 (736 SE2d 380) (2013).

(a) King contends his trial counsel was ineffective for failing properly to obtain certification of medical records from the time of King's incarceration, preventing their admission under the so-called business records exception to the rule against hearsay.  See OCGA § 24-8-803 (6).  King argues that his trial counsel's failure to obtain proper certification was constitutionally deficient because counsel had ample time to do so and the decision not to obtain proper certification was not a part of her trial strategy.  He further argues that he suffered prejudice as a result because the jurors were unable to review the records themselves and instead had to rely on testimony about what the records contained, and the jury might not have found the witnesses' testimony about the records credible.  Assuming without deciding that his trial counsel was deficient in this respect, King has failed to meet his burden of showing prejudice.

At trial, while questioning Dr. Norman, King sought to admit certified medical records from King's post-arrest visit to Central

State Hospital. The court did not admit those records but suggested to King's trial counsel that if she wanted them admitted into evidence, she should "start making some efforts" to obtain proper certification. Even though the medical records themselves were not admitted into evidence, Doctors Norman, Flanagan, and Gambow testified that they reviewed those records, and Dr. Flanagan and Dr. Gambow testified about the contents of the records.

King's trial counsel testified at the motion for new trial hearing and said that she discovered there was an issue with getting the relevant medical records certified "right before trial." Knowing "that [the] doctors were going to be able to testify about" the records, which is "what mattered," she did not seek a continuance to obtain certification so that the records themselves could be admitted. When asked whether there were "items in the medical records that tended to support" King's defense that were not "discussed by each of the doctors," she said "[n]ot that I recall, no." King did not admit the medical records into evidence at the motion for new trial stage, and the trial court held that King did not suffer any prejudice from

28

counsel's alleged deficiency in failing to obtain certified copies of the records and admitting them into evidence.

Here, King has failed to show prejudice because he has failed to show that there is a "reasonable probability" of a better result had his trial counsel admitted those medical records. *Foreman v. State*, 306 Ga. 567, 570 (832 SE2d 369) (2019) (citation and punctuation omitted). King did not admit the medical records at the motion for new trial stage, nor has he pointed to anything contained in the records that would have been useful to him that the jury did not hear at trial. We are accordingly left to speculate about the records' contents and their utility to King, whether by corroborating the witnesses' testimony about the records or providing additional, helpful information. But speculation is insufficient to show prejudice. See id. at 570-571 (defendant failed to show prejudice from his trial counsel not calling a certain witness and putting a photograph of the witness into evidence at trial when the defendant did not have the witness testify at the motion for new trial hearing

and did not put a photograph of the witness into the motion for new trial record).  Accordingly, this claim fails.

(b) King contends that his trial counsel provided ineffective assistance of counsel by not objecting to testimony about his drug and alcohol consumption as improper character evidence.  This claim was not raised at the motion for new trial stage, when King had new counsel, so it is waived.  See *Elkins v. State*, 306 Ga. 351, 361 (830 SE2d 217) (2019).

(c) King argues that his trial counsel provided ineffective assistance by not objecting to an alleged "golden rule" violation.  See *Menefee v. State*, 301 Ga. 505, 512 (801 SE2d 782) (2017) (defining the "golden rule").  Because we see no violation of the "golden rule," we conclude that King's trial counsel was not constitutionally deficient in this regard.

During closing, the prosecutor said the following:

> Close your eyes.  I want you to envision it being a beautiful spring morning here in Decatur, Georgia, March 28th, 2018.  The sun is out.
> The weather was nice.  Michael Brooks is walking along Glenwood [Road] in Decatur, Georgia.  He was

30

walking to the bus stop to go home to meet his mom, Hannah Pittmon, to help her clean that day because she owned a cleaning business. He was walking. I want you to imagine a pickup truck driving down Glenwood Westbound, seeing Michael, making a U-turn right at Hooper Street, driving back down and passing Michael, turning into the parking lot of [the restaurant], and lying in wait for him to walk by. I want you to picture Michael walking and passing that pickup truck. I want you to envision this sound as Michael walks by. I want you to envision Michael dropping to the ground and sliding along that sidewalk after being shot. I want you to picture him being able to pick his injured body up and run away from the danger and try to run to safety, but collapsing again because of the injury he just sustained. I want you to picture the defendant getting out of his truck and chasing Michael into the middle of that road and standing over him and shooting him multiple times over and over and over and over and over and over again, and unloading his clip. I want you to picture [multiple witnesses] watching in horror. I want you to hear the women yelling, no, from inside of that salon. I want you to continue to walk with me down this lane of horrible memories. I want you to picture these people, these witnesses, running to Michael's aid, but it's too late. I want you to picture the defendant walking away after nodding his head like, yeah, I did that, getting in his truck and driving off. I want you to envision the trauma that these people probably still experience because of what they witnessed. I want you to picture Ms. Pittmon getting that call that day from a detective telling her that her son was murdered and him walking out of her life for eternity. Then I want you to picture the defendant, as he put it on a jail call, walking because y'all find him not guilty. I want y'all to picture him walking amongst us at some

point in time in the future because y'all find him not guilty by reason of insanity. Now, I want you to open your eyes from that nightmare, and I want y'all to go back to the jury deliberation room after the judge gives you the law and find him guilty.

King claims the State violated the "golden rule" when it asked the jury to imagine King "walking amongst us at some point in time in the future because [the jury found] him not guilty by reason of insanity."[10]

Under Georgia law, "golden rule" violations occur when a party asks the "jurors to place themselves in the position of the victims." *Menefee*, 301 Ga. at 512. But the prosecutor here did not ask the jurors to place themselves in the victim's position, so a "golden rule" objection would have failed. See *Rucker v. State*, 291 Ga. 134, 138 (728 SE2d 205) (2012) (concluding that the prosecutor did not violate the "golden rule" when the defendant raised an insanity defense and the State pointed "out the number of potentially dangerous people

---

[10] King does not contend that the State's closing argument included commentary about his "future dangerousness." See, e.g., *Wyatt v. State*, 267 Ga. 860 (485 SE2d 470) (1997). We express no view on that issue, including about whether an argument about future dangerousness would be undermined by recent legal developments.

like [him] in society" and said, "Are we really so sure of this science of forensic psychology and psychiatry that we bet our lives on it?"); *Sanders v. State*, 290 Ga. 637, 640 & n.3 (723 SE2d 436) (2012) (concluding that a prosecutor did not violate the "golden rule" by stating that "it could have been anybody" whom the defendant killed), superseded by statute on other grounds as recognized in *State v. Orr*, 305 Ga. 729, 736 (827 SE2d 892) (2019). And because failing to make a meritless objection is not constitutionally deficient, *Jones v. State*, 314 Ga. 466, 471 (877 SE2d 568) (2022), this claim fails.

(d) King contends that his trial counsel was ineffective by not objecting to alleged misstatements about the definition of voluntary intoxication and not requesting a clarifying instruction about the interaction between voluntary intoxication and insanity—the same statements at issue in his second enumeration of error. Assuming without deciding that his trial counsel was deficient, King has failed to show he was prejudiced.

As with King's second enumeration of error, King takes issue with witness testimony and the State's argument that voluntary intoxication is not a defense. A more accurate statement of law, he argues, would have included that voluntary intoxication is a defense "in the extreme situation" where the intoxication results in a "permanently altered" "brain function so as to negate intent." See *Perez*, 309 Ga. at 690 n.2 (citation and punctuation omitted).

But King has failed to show that there is a reasonable probability that he would have achieved a better result at trial but for this assumed deficiency. See *Munn v. State*, 313 Ga. 716, 728 (873 SE2d 166) (2022) (citation and punctuation omitted). Indeed, King's argument suffers from the same defect as in the second enumeration: the theory of King's defense at trial was that he was temporarily insane and that he was not voluntarily intoxicated at all; he did not argue that he suffered from permanent brain damage preventing him from manifesting intent, and he has not pointed to any evidence at trial (nor have we identified any) that would have supported that theory. Thus, King has failed to show that, had the

34

jury been aware that voluntary intoxication could potentially be a defense in an "'extreme situation,'" *Perez*, 309 Ga. at 690 n.2 (citation omitted), there is a reasonable probability he would have achieved a better result at trial. See *Choisnet*, 295 Ga. at 572-573; *Grier v. State*, 313 Ga. 236, 246 (869 SE2d 423) (2022) ("The test for prejudice in the ineffective assistance analysis is equivalent to the test for harm in plain[-]error review.") (cleaned up). See also *Munn*, 313 Ga. at 723, 728 (defendant was not prejudiced by trial counsel not requesting jury instruction on justification when the evidence of justification was weak). This enumeration therefore fails.[11]

*Judgment affirmed. All the Justices concur.*

---

[11] Citing *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020), King also argues that the cumulative effect of the errors and deficiencies in his case affected the outcome of his trial even if none did alone. Assuming one error in the plain-error context (that the trial court admitted testimony misstating the law of voluntary intoxication) and two deficiencies in the ineffective assistance of counsel context (the first concerning trial counsel's failure to obtain properly certified medical records and the second also concerning the misstatements of the law of voluntary intoxication), King "has not demonstrated a reasonable probability that, but for these failures, the outcome of the proceeding would have been different." See *Payne v. State*, 314 Ga. 322, 334 (877 SE2d 202) (2022) (cumulative effect of a presumed clear error by the trial court not giving an accomplice corroboration charge, a presumed deficiency by trial counsel for not requesting that charge, and a presumed deficiency by trial counsel for not objecting to hearsay was insufficient to establish cumulative error).

Decided June 21, 2023.

Murder. DeKalb Superior Court. Before Judge Johnson.

*SK Law Group, Scott R. King*, for appellant.

*Sherry Boston, District Attorney, Buffy D. Thomas, Deborah D. Wellborn, Ashley C. O'Neal, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.